### UNITED STATES v. 25.4 ACRES OF LAND et al.

### UNITED STATES v. 53¼ ACRES OF LAND et al.

Misc. Nos. 586, 494.

District Court, E. D. New York.

April 2, 1947.

See, also, 71 F.Supp. 255.

Harry T. Dolan, of Brooklyn, N. Y., Sp. Ass't to the Atty. Gen. of the U. S., for the United States.

Cullen and Dykman, of Brooklyn, N. Y. (Jackson A. Dykman, Sigourney B. Olney and Augustus J. Wheeler, all of Brooklyn, N. Y., of counsel), for The Brooklyn Union Gas Co.

Beardsley & Taylor, of New York City (Cameron F. MacRae, Earl G. Clarke and Robert G. Miller, all of New York City, of counsel), for Consolidated Edison Co. of New York.

BYERS, District Judge.

These proceedings have been explained in 65 F.Supp. 333, and pursuant to the suggestion that the claimants might wish to present an alternative theory for computing their damages to that of reproduction cost less depreciation, testimony has been taken on behalf of both claimants, which will be discussed as briefly as possible.

That the misgiving heretofore expressed as to the applicable rule of damages was not entirely irrational seems to appear from a footnote to the opinion of Mr. Justice Reed in Federal Power Commission v. Hope Gas Co., 320 U.S. 591, at page 622, 64 S.Ct. 281, at page 297, 88 L.Ed. 333: " * * * Reproduction cost as the cost of building a replica of an obsolescent plant is not of real significance." The mains, service, conduits, and other fixtures here involved were rendered incapable of use by the taking which gave rise to these proceedings.

The effort will be made to avoid repetition of matters deemed to have been covered in the earlier opinion, although that may not always be possible in view of the nature of some of the arguments which require consideration.

■ The position of the Government as now understood, and stated in lowest terms, is this:

These claimants are not entitled to any compensation for the taking of these properties, because the land which was condemned, some 70 acres or more, was added to the Navy Yard; upon that addition new buildings were erected, and new subsurface pipes, conduits and connections were laid by the Government to effect exterior connection with the mains of the Gas Company near the boundaries of the enlarged Yard, and similar connections were made to sources of electric energy owned and operated by the Edison Company; more gas and electricity were consumed in the new buildings and structures during the years 1942–1946 than had been sold to private consumers under the conditions existing at the respective dates of taking (April 1, 1941, and September 19, 1941). That beneficial result, it is argued, more than compensates the claimants for any loss sustained through the takings in question, and hence no award to either is legally possible.

This assertion turns attention to the results of the taking, rather than to the value of the property to the claimants at the time of taking. This means that the question of value is thus made to turn upon the decision by the Government as to the use it would make of the land condemned. I should suppose that it could have been decided to excavate the entire area and flood it for the purpose of a basin, if the needs of the Navy had so required. Equally, the Government could have decided to manufacture its own gas, and to generate its own electric power (as it did to a marked extent as to high tension current) within the parcel so condemned. In either event, of course, the claimants would not have been favored by a greater sale of gas and electric current within that area, and the argument would not have been advanced. But if it is sound in principle, its validity should not be resolved according to fortuitous circumstance, or the course of events.

Stated otherwise, the argument seems to be that because a new governmentally constructed distribution system can be supplied from outside the expanded Navy Yard, with gas and electric current as required, the distribution plant which has been taken had no value at the time of taking. If that reasoning exposes a sequitur, I am unable to perceive it.

■ It is too late in the day to question the rule that "value is to be ascertained as of the date of taking" (United States v. Miller, 1943, 317 U.S. 369 at page 374, 63 S.Ct. 276, at page 280, 87 L.Ed. 336, 147 A.L.R. 55, citing cases.)

Seemingly the Government argues that what is referred to in the same opinion as a subsidiary rule applies here, on the theory that the increase in said consumption of gas and electric energy implied or involved a benefit to the parts of the companies' integrated systems not so taken, and that such benefits should in effect be assessed against the latter. The relevant passage in the opinion (317 U.S. 376, 63 S.Ct. 281) is this: "As respects other property of the owner consisting of separate tracts adjoining that affected by the taking (i. e. the unaffected part of these claimants' distribution facilities and plants), the Constitution has never been construed as requiring payment of consequential damages; *and unless the legislature so provides, as it may, benefits are not assessed against such neighboring tracts for increase in their value.*" (Emphasis supplied)

Since these claimants are not asserting a claim for consequential damages to property not actually taken; and since there is nothing in the legislation under which this condemnation was effected touching an assessment for benefit, it seems clear that reliance upon the suggested theory is without support in reason or authority.

■ It is also too late to deny that to the extent to which the claimants' physical properties in the pipes, conduits, etc., involve also the franchise rights to operate them, these elements, taken together, constitute the basis upon which value must be predicated.

The nature of the problem is so completely the subject of exposition in Monongahela Navigation Co. v. United States, 1893, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463, that there is no excuse for misunderstanding it. Incidentally, that case was cited as an authority in the Miller opinion written but four years ago; at page 343 of 148 U.S. at page 633 of 13 S.Ct., Mr. Justice Brewer,

speaking for a unanimous court, said: "It is also suggested that the government does not take this franchise; that it does not need any authority from the State for the exaction of tolls, if it desires to exact them; that it only appropriates the tangible property, and then either makes the use of it free to all, or exacts such tolls as it sees fit, or transfers the property to a new corporation of its own creation, with such a franchise to take tolls as it chooses to give. But this franchise goes with the property; and the Navigation Company, which owned it, is deprived of it. The government takes it away from the company, whatever use it may make of it; and the question of just compensation is not determined by the value to the government which takes, but the value to the individual from whom the property is taken; and when by the taking of the tangible property the owner is actually deprived of the franchise to collect tolls, just compensation requires payment, not merely of the value of the tangible property itself, but also of that of the franchise of which he is deprived."

Earlier (148 U.S. 329, 13 S.Ct. 627) it was said: "So, before this property can be taken away from its owners, the whole value must be paid; and that value depends largely upon the productiveness of the property, the franchise to take tolls."

The idea is the same as that which was seeking expression in the earlier opinion in this case in which reference was made to "the earning power which attached thereto", meaning the properties here involved.

It is also argued by the Government that since the awards made for damage parcels privately leased from the City of New York were based in part upon their being in receipt of gas and electric current for consumption on those respective premises, the awards made in connection therewith must be deemed to have embraced the claims now asserted, and claimants' compensation should have been carved therefrom.

■ It is difficult, if not impossible, to follow that argument. The testimony of the expert on damage parcel values was imported into this record by consent, and is as follows:

" 'Q. Your value of this entire property as an entity reflected all of the street im-provements, including pavements, water mains, sewers, lighting and so forth, did it not?'

"The answer is: 'A. All that you have enumerated. It includes all you have enumerated. It did not include any refrigeration service. It included the regular utilities like water, gas, electricity and street pavements and sewers.' "

The obvious meaning of the foregoing is that the damage parcels were appraised as being improved in the respects indicated; the testimony had nothing to do with the mains, conduits, etc., which lay in the beds of the several streets and ways, nor could it, since those things did not form a physical part of any of the several damage parcels, but constituted properties of these claimants.

■ The bed of Washington Avenue was vested in the City of New York, but since it was burdened with the public easements as a highway or street, it had no market value and the damage award was in the sum of one dollar.

■ It is the present view that there is a clear legal difference between mains, pipes, conduits, etc., which are performing their functions as the media of conveying gas and electric current as active elements in a going enterprise on the day of taking, and a mere collection of abandoned devices of that kind, which, instead of reposing upon a scrap heap, are allowed to remain idle and inert in the pits and trenches of their initial installation. If the reasoning of this opinion is erroneous, that is probably the major infirmity.

The foregoing reflections are intended to clear the way to a consideration of the difficult aspect of the controversy, which is to find a formula for computing the damages. To borrow again fom the Miller opinion (317 U.S. page 375, 63 S.Ct. 281): "Courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings."

Unfortunately the present requirement is to design such a rule for this case, since no precedent seems to be available.

■ The productiveness of these installations is, of course, related to the financial returns from their operation, and the first

requirement is to state their probable life expectancy, in order to measure the annuity period and thus the annual payment required to equal the original cost. In order that the capital outlay thus being returned may earn its keep, interest on the diminishing amount thereof is included in the annual sums so computed to be payable.

The physical life expectancy is based upon experience and is thus a reliable basis for opinion.

The cost of money to utilities, namely, the interest charge, is equally a matter of statistical information, and hence forms the basis of informed opinion.

These two factors were explained by the claimants' expert engineer, Mr. Scharff, and other matters to be alluded to in connection with his testimony; the Government called no witness to refute any of his data, but contents itself with arguing that the basis of his opinion on values is hypothetical, speculative and conjectural. Olson v. United States, 292 U.S. 246, at page 257, 54 S.Ct. 704, at page 709, 78 L.Ed. 1236, is cited in support of that assertion. The applicable language is: "Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth."

The case itself is factually remote from this, but the quoted language tends to fortify rather than to undermine the validity of the data upon which the opinions of Mr. Scharff are based, since the cost of these installations, their durability, the earnings allocated to their operations, and the cost of money to utilities are not only reasonably probable in character, but are statistically demonstrable. The nature of the present problem is much closer to that considered in connection with another aspect of this very condemnation in Brooklyn Eastern District Terminal v. City of New York, 2 Cir., 139 F.2d 1007, at page 1013, 152 A. L.R. 296, in expounding which the Court said: " * * * Here we have an interest not bought and sold in the market, and sale value must be somewhat hypothetical, though probably not unusually so as condemnation values go. See * * * (citing cases). Loss of business profits as such is not allowable, Mitchell v. United States, 267 U.S. 341, 345, 45 S.Ct. 293, 69 L.Ed. 644; but in default of more direct evidence of sale value, present value (i. e., as of the time of taking) of clearly to-be-expected future earnings may be considered. See * * * (citing cases)."

The expert testimony therefore presented by the claimants will be given heed in the belief that it offers a rational basis upon which to reach a conclusion as to a fair and just basis of compensation to these claimants for their properties which have been taken by the United States, but for which the latter says no payment should be made.

Since the utility companies are not permitted to fix their own prices for the commodities which they sell, but must charge rates which are permitted by governmental agencies, it follows that such elements as depreciation, and fair return upon capital must be computed in connection with operating expenses, and whether there is any margin between the aggregate of these, and the total sum collected from the public will depend in part upon the admitted bases of the first two items mentioned. The witness explains the situation thus: "Public utility service sale prices or rates are not fixed by free competition, but are subject to governmental regulation at a level which is generally described as reasonable when it covers operating expenses and depreciation and allows a fair return on the fair value of the property used and useful in the public service. * * * obviously revenue depends upon rates and if rates depend upon depreciation and return on fair value you are led into a closed circle of reasoning from which there is no escape except by the establishment of some independent principle."

His understanding of the basic purpose of rate regulation is to give the consuming public the benefit of competition based upon the value of the service if it were to be furnished according to operating ex-

penses and fixed charges as resulting from the functioning of such facilities of the most modern and economical type.

▇ That would seem to provide a fair standard of value for present purposes.

He has taken cross observations, so to speak, which embrace, as to the Gas Company (a) cost of construction of such facilities as last referred to; (b) the annuity required for the returns specified, on a 65-year expectancy; (c) computed service value of existing facilities upon a 40-year future life (as at taking), the return being restricted to the ideal plant, for comparison with the actual installation; and (d) present worth of loss of income as computed, arising from the taking over a 40-year period—not, however, as a presently applicable index of value, but for such use as it may have in comparison to the earning power attributed to the installations made by the Government in substitution for those taken.

No one of the foregoing elements has controlled his views, but they constitute the factors which have been influential in enabling him to express his opinion that the value of the property and rights taken from the Gas Company as of the critical dates was $14,750 as to the Wallabout tract (Cal. No.M-494) and $4,750 as to the Kent Avenue addition (Cal.No.M-586), or a total of $19,500.

In addition to the criticism of the Scharff testimony already referred to, the Government also urges that "it is the equivalent of valuation established through capitalization of earnings or income and which the courts have consistently rejected as a basis of awarding compensation in public utility condemnations", citing Orgel and cases.

Quotation is permissible from two of these citations:

Orgel, Valuation under Eminent Domain, Chapter XIX, § 216, at pages 711, 712:

"In the commission cases, earnings are often introduced in connection with going concern value. We have already noted that the tribunals consider earnings in deciding whether the utility is profitable. We have also examined some of the proposed methods of estimating going concern value on the basis of earnings. We may surmise that the going concern value and consequently the final award is much influenced by the earnings. But the tribunals have rarely stated any formula or method by which they use evidence of earnings to arrive at either the going concern value or the total just compensation. They have been content to let the matter rest with the statement that earnings would be considered and that a reasonable allowance would be made, or that an indefinite amount will be added to the physical value.

"But whether evidence of earnings is considered as bearing on the franchise value or on the going concern value or on the value of the entire property, the tribunals are unanimous in rejecting capitalization of earnings as a means of arriving at value. * * *"

Kennebec Water District v. Waterville (1902), 97 Me. 185, at page 201, 54 A. 6, at page 12, 60 L.R.A. 856, contains a most helpful discussion, among other things stating the substance of part of what has been quoted above from the Scharff testimony: "And it may be said that the fair and equitable value of the system of the Maine Water Company, as a whole, may, in a large sense, be measured by its net income at reasonable rates, taking into account future probabilities."

And at pages 220 and 221 of 97 Me., at page 20 of 54 A.: "* * * It is doubtless true that the property to be taken, both plant and franchises, are to be appraised, having in view their value as property in itself and their value as a source of income. The physical property has value irrespective of the franchise, and the franchise without reference to the physical property. But these two kinds of value practically shade into each other. The value of the physical property is enhanced by the existence of franchises which make it usable. The value of franchises is enhanced by the existence of physical property by which they may be profitably exercised. There are these items of property, but only one entire system. There are all of these elements of value, from which is to be estimated the value of the entire property, tangible and intangible, as a whole. The plaintiff is not to take the

physical property without the franchises, nor the franchises without the physical property. It will pay one gross sum as an entire value, and take all the property. The consideration of the elements will be useful only as it will enable the appraisers to fix the just compensation to be paid for the entire property as a whole.

"But we cannot assent to the proposition that the capitalization of income even at reasonable rates can be adopted as a sufficient or satisfactory test of present value. Such a capitalization would fix at the present time a specific value which would continue for all time to come, as a fixed and unvarying source of income, no matter how conditions may be changed.

" * * * Therefore the basis for capitalization is too uncertain to afford a satisfactory test of value. *By this we do not mean to say that, while not a test, present and probable future earnings at reasonable rates are not properly to be considered in determining value. We have already stated that they are.*" (Italics supplied.)

The Scharff opinion of value is therefore seen to have been based upon a number of considerations, all of which bear upon the subject matter, and none of which has been permitted to predominate the eventual expression.

Turning now to the Edison Company claim, substantially the same factors have been weighed, and substantially the same process of taking cross-bearings has been followed, with the result that the same witness has expressed the opinion that the service value of the Wallabout tract facilities was $98,500 and of the Kent Avenue properties $47,500, or a total of $146,000.

He did not include in these figures the transformers and transformer installations which were removed; and from his figures there is to be deducted the net salvage value of the transformers and cables which have been removed (under stipulation about to be referred to); the former at $5,633.15 is chargeable to the facilities in the Wallabout tract, plus $750.78 for cables, and $500.52 for cables from the Kent Avenue tract, or a total of $6,884.45.

The stipulation provides that the Edison Company "shall have the privilege of removing any and all of the property or equipment owned or claimed by it at the time of the taking and located within the area of the acquisition at any time before an order or judgment has been entered in this proceeding, finally determining the status and compensable character of such property as is allowed to remain and for which compensation is claimed", and "that the removal of such property or equipment by the defendant, Brooklyn Edison Company, shall not constitute any waiver of its right or claim to compensation for any part of said property not removed and allowed to remain in the area of acquisition".

Further, that the Edison Company claim should be reduced by the "present fair market value of the equipment so removed as of the date of removal".

Argument is addressed to certain aspects of the situation resulting from the making of the stipulation:

(a) That the removable property could not constitute an interest in real estate. For reasons attempted to be stated in the earlier opinion, this contention is deemed to be unsound. The fact that a part of the equipment could be removed intact, does not affect either the nature of that which could not be, nor the essential character of the installations as they constituted, at the taking, a distributing unit as a whole.

(b) The fact, that one factor taken into consideration by the witness Scharff involved a return of and return on capital invested in part in that which was removed, "is interesting"; so it is. It is not easy to see how the investment could be accounted for except in its entirety.

(c) Credit has been given for "salvage value" instead of "present fair market value" as to the removed equipment. References to the record indicate that inventory figures or replacement costs were adopted in establishing the amount of the credit. Since the Government offered no testimony on the subject, there is no basis for discrediting the values so employed.

It is not apparent how the stipulation, or that which was done to carry it

into effect, alters the status of this claimant. The Government took this equipment and in effect sold that which was marketable. The identity of the purchaser cannot affect the legal nature of the problem presented by the necessity for making fair compensation for property taken, in obedience to constitutional requirements.

A painstaking review of the record indicates that Mr. Scharff's opinions on value have been studiously formulated and have been based upon logically and legally fortified data. Nor can they be discounted solely because he was retained and presumably compensated for his expert services, as a witness for the claimants.

In preference, however, to the values as computed by the witness, it appears that a service value based upon a 20-year instead of a 40-year expectancy would meet the requirements of fair compensation, and accordingly the Court hereby makes and states the following awards:

| To Brooklyn Union Gas Company: | | |
|---|---|---|
| Wallabout tract (No. M–494).... | $11,963.00 | |
| Kent Avenue tract (No. M–586) | 3,877.00 | |
| Total ...................................... | | $ 15,840.00 |

| To Consolidated Edison Company: | | |
|---|---|---|
| Wallabout tract (No. M–494)... | $78,432.00 | |
| Less Transformers.... $5,633.15 | | |
| Cables, etc....... 750.78 | 6,383.93 | $ 72,048.07 |
| Kent Avenue tract (No. M–586) | $37,381.00 | |
| Less Cables, etc.................. | 500.52 | 36,880.48 |
| Total ...................................... | | $108,928.55 |

Settle order in accordance with the foregoing.