In the Matter of the CITY OF NEW YORK, Appellant and Respondent, Relative to Acquiring Title to GILLEN PLACE, from Bushwick to Jamaica Avenues, in the Borough of Brooklyn. BROOKLYN UNION GAS COMPANY, Respondent and Appellant; CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Respondent.

Argued March 10, 1952; decided June 5, 1952.

*Denis M. Hurley, Corporation Counsel* (*Reuben Levy, Harry E. O'Donnell, Samuel K. Handel* and *William A. Marks* of counsel), for City of New York, appellant and respondent. I. The right of the utility companies to use the public streets for the purpose of exercising their franchises to sell gas and electricity to the public is subject to their obligation to relocate their equipment in such streets at their own expense whenever the public interest so requires. The relocation of public utility equipment in the bed of Gillen Place having been necessitated by the closing of Gillen Place in the public interest, it follows that the expense of such relocation must be borne by the utility companies. (*People ex rel. Brooklyn Union Gas Co.* v. *Littleton,* 110 App. Div. 728, 185 N. Y. 605; *New York City Tunnel Authority* v. *Consolidated Edison Co.,* 295 N. Y. 467; *American Rapid Tel. Co.* v. *Hess,* 125 N. Y. 641; *Matter of Delaware Riv. Joint Comm.,* 342 Pa. 119; *Philadelphia Elec. Co.* v. *Commonwealth,* 311 Pa. 542; *New Jersey Bell Tel. Co.* v. *Delaware Riv. Joint Comm.,* 125 N. J. L. 235; *Matter of Mayor of City of N. Y.* [*Deering*], 28 App. Div. 143, 157 N. Y. 409; *People ex rel. New York Central & H. R. R. R. Co.* v. *Gourley,* 198 N. Y. 486; *New York Central R. R. Co.* v. *Westchester Lighting Co.,* 226 App. Div. 825; *New England Tel. & Tel. Co.* v. *Boston Term. Co.,* 182 Mass. 397; *New York Tel. Co.* v. *State of New York,* 169 App. Div. 310, 218 N. Y. 738; *Transit Comm.* v. *Long Island R. R. Co.,* 253 N. Y. 345; *Stirnweis* v. *Cacioppo,* 258 N. Y. 68; *People ex rel. Woodhaven Gas Light Co.* v. *Deehan,* 153 N. Y. 528.) II. Installations like those involved here have always retained their essential character of personal property. (*People ex rel. Citizens' Gas-Light Co. of Brooklyn* v. *Board of Assessors of City of Brooklyn,* 39 N. Y. 81; *People ex rel. Western Union Tel. Co.* v. *Dolan,* 126 N. Y. 166; *People ex rel. New York Edison Co.* v. *Feitner,* 99 App. Div. 274, 181 N. Y. 549; *Poughkeepsie Gas Co.* v. *Citizens' Gas Co.,* 20 Hun 214, 89 N. Y. 493; *Buffalo Gas Co.* v. *Volz,* 31 Misc. 160.)

*Jackson A. Dykman, Augustus J. Wheeler* and *Herman Meltzer* for Brooklyn Union Gas Company, respondent and appellant. I. Claimant's special franchise and physical property were inseparable and together constituted an indefeasible interest in the land in the street. (*Ghee* v. *Northern Union Gas*

Co., 158 N. Y. 510; *Louisville* v. *Cumberland Telephone Co.,* 224 U. S. 649; *People ex rel. Metropolitan St. Ry. Co.* v. *State Bd. of Tax Comrs.,* 174 N. Y. 417; *Syracuse Water Co.* v. *City of Syracuse,* 116 N. Y. 167; *New York Tel. Co.* v. *State of New York,* 169 App. Div. 310, 218 N. Y. 738; *Story* v. *New York Elevated R. R. Co.,* 90 N. Y. 122; *Brooklyn Eastern Dist. Terminal* v. *City of New York,* 139 F. 2d 1007; *United States* v. *Brooklyn Union Gas Co.,* 168 F. 2d 391.) II. The Administrative Code of the City of New York recognizes the existence and nature of claimant's property and establishes its right to an award in this proceeding. (*Matter of City of New York [Fort Greene Houses],* 177 Misc. 101, 266 App. Div. 795, 291 N. Y. 788.) III. Where the property of a utility in a street is affected or damaged by a closing under title E of the Administrative Code and compensation is therefore mandatory the court should take proof and award damages in the most practicable and reasonable way. (*United States* v. *Miller,* 317 U. S. 369; *Heiman* v. *Bishop,* 272 N. Y. 83; *National Cellulose Corp.* v. *State of New York,* 292 N. Y. 438; *United States* v. *Town of Nahant,* 153 F. 520; *City of Little Falls* v. *State of New York,* 198 App. Div. 488.)

*John M. Keegan, Earl G. Clarke* and *John D. Gray* for Consolidated Edison Company of New York, Inc., respondent. I. The street closing provisions of title E of the Administrative Code provide for and require the making of an award for the damage, extinguishment and destruction of the Edison company's franchise rights and the structures appurtenant thereto in Gillen Place. (*City of New York* v. *Aviation Distributors,* 84 N. Y. S. 2d 84; *Lawrence Constr. Corp.* v. *State of New York,* 293 N. Y. 634; *Matter of Russo* v. *Valentine,* 294 N. Y. 338; *Palmer* v. *Larchmont Elec. Co.,* 158 N. Y. 231; *Barber* v. *Woolf,* 216 N. Y. 7; *Matter of City of New York [Newton Ave.],* 219 N. Y. 399.) II. The closing and discontinuance of Gillen Place is a title E street closing condemnation proceeding and not a matter of regulation under the police power. (*Transit Comm.* v. *Long Island R. R. Co.,* 253 N. Y. 345; *City of Chicago* v. *Baker,* 86 F. 753.) III. The compensation to which the Edison company is justly entitled should be measured by the cost of relocating and reintegrating its electrical distribution system in

another location. (*United States* v. *25.4 Acres of Land,* 71 F. Supp. 255; *United States* v. *City of New York,* 168 F. 2d 387; *United States* v. *25.4 Acres of Land,* 65 F. Supp. 333; *City of Little Falls* v. *State of New York,* 198 App. Div. 488; *United States* v. *Town of Nahant,* 153 F. 520.)

FROESSEL, J. The City of New York brought this proceeding under title E of chapter 15 of the Administrative Code of that city, entitled " STREET CLOSING CONDEMNATION PROCEDURE ", pursuant to resolution of the board of estimate, for ascertainment and payment of compensation to owners of property affected or taken by virtue of the closing and discontinuance of Gillen Place, a street in Brooklyn. Claims were filed by Consolidated Edison Company of New York, Inc., and the Brooklyn Union Gas Company for alleged damages to their franchises and to mains and services located in said street.

After the hearing of objections, a final decree was made awarding damages to said claimants measured solely by the cost of relocating claimants' facilities. As to Brooklyn Union, an award was therefore made only for its twenty-inch main, the relocation cost of which was stipulated, no award being made for its six-inch main, which was abandoned and regarded by the court as antiquated. As to Consolidated Edison, the cost of relocating its facilities was also stipulated. The Appellate Division unanimously affirmed the final decree. Both the city and Brooklyn Union have appealed by our leave.

The basis for Special Term's finding that the street closing herein was for a proprietary rather than a governmental purpose appears in the official documents pertaining to the closing of Gillen Place, which make it manifest that it was not a highway purpose which inspired the action taken. Thus, the city planning commission stated that the borough president proposed the closing " in order that the closed street area may be consolidated with abutting Board of Transportation properties." The layout plans for a proposed bus garage and shop on said property " indicate that the proposed structure will occupy the bed of Gillen Place." The report noted that " Gillen Place is in use and improved but its closing and discontinuance appear to be unobjectionable ", and stated that the commission had " determined that the map is an element in

the formal process of closing and discontinuing an unnecessary street in order that the street area and the abutting City-owned property may be consolidated to permit expansion of City transit storage and repair facilities.'' The property formerly constituting the bed of the street was eventually assigned to the board of transportation, precisely as proposed.

Street closing statutes have as their primary purpose the securing and preservation of the '' regularity and uniformity of the streets '' (Administrative Code of City of New York, § E15–3.0, and its prototype, L. 1895, ch. 1006, as amd. by L. 1923, ch. 752). Such a purpose is governmental, and the act of closing a street is to that extent a sovereign one (*Matter of Mayor of City of N. Y.* [*Deering*], 28 App. Div. 143, affd. 157 N. Y. 409). The city contends that this street closing condemnation proceeding is founded on '' public necessity '', and that the city, as condemnor, is not required to pay claimants any compensation. It is said that the motive for its action is immaterial, so long as the necessary findings are made to support it, i.e., that the street is no longer necessary. Thus, the city points to the resolution of the board of estimate authorizing the closing, which declared the '' public necessity of discontinuing and closing Gillen Place ''. However, that resolution must be read in the light of the above-quoted section E15–3.0 of the Administrative Code, which does not stop with the quoted words '' public necessity '', but includes them in this context: '' The city may authorize the closing or discontinuance of such streets therein, in whole or in part, as it may be deemed necessary in order to more effectually secure and preserve the regularity and uniformity of the streets therein, *or where other public necessity requires the closing or discontinuance of such streets* '' (emphasis supplied).

The '' other public necessity '' mentioned in the statute may well be applied to necessity arising in connection with the transit system which, though operated in the public interest (see Rapid Transit Law, § 33), is nevertheless proprietary in nature and, as we have noted, involves a city purpose, '' like the building of streets or highways '' (*Litchfield Constr. Co.* v. *City of New York,* 244 N. Y. 251, 263). In this proceeding, the city claims that its right to close the street has not been challenged, but this is disputed by respondent Brooklyn Union.

In any event, in view of the language of the statute, which permits the words " public necessity " as used in the resolution of the board of estimate to be interpreted as meaning other than necessities affecting the street system, the courts below were justified in concluding from this record that the purpose for which the street was closed was a proprietary one. In this connection, it should be noted that the only way in which the board of transportation could ever acquire this land would be through a street closing proceeding, for so long as Gillen Place remained a street it had to be held by the city in trust only for street uses (Administrative Code, § B15–38.0).

It is true, of course, that street closings usually result in the ultimate appropriation of the land to private ownership, but there is a great difference where, as here found, the very purpose of the closing is to accomplish the devotion of the land to a use by the city which, although in the interest of the public, is nevertheless proprietary. The plain facts are that claimants have been forced to abandon their installations in Gillen Place and reconstruct them elsewhere and for a much greater distance in order to make room for the bus garage and shop, and in such circumstances they are entitled to be compensated for their loss (*City of New York* v. *New York Tel. Co.*, 278 N. Y. 9; *Los Angeles* v. *Los Angeles Gas Corp.*, 251 U. S. 32; *Matter of Board of R. T. R. R. Comrs. of City of N. Y.*, 197 N. Y. 81, 96–97; *Litchfield Constr. Co.* v. *City of New York, supra*; *Postal Tel.-Cable Co.* v. *Depew & Lancaster Light, Power & Conduit Co.*, 251 N. Y. 562; *New York & Queens Elec. Light & Power Co.* v. *City of New York*, 221 App. Div. 544). As we said in *Transit Comm.* v. *Long Island R. R. Co.* (253 N. Y. 345, 352) " when the change is required in behalf of other public service corporations or in behalf of municipalities exercising a proprietary instead of a governmental function ", the common-law rule that utilities maintain their installations in public streets subject to the risk of relocating them at their own expense when public necessity so requires, does not apply.

Assuming, however, that the street closing proceeding was instituted to secure uniformity of the city street system, in the exercise of governmental power, still by reason of the statute claimants are not bound by the common-law rule as reasserted in such cases as *Consolidated Edison Co.* v. *State of New York*

(302 N. Y. 711); *New York City Tunnel Authority* v. *Consolidated Edison Co.* (295 N. Y. 467); *Matter of Town of Cheektowaga Grade Crossings* (283 N. Y. 687); *Transit Comm.* v. *Long Island R. R. Co.* (253 N. Y. 345, *supra*); *Matter of Deering* (93 N. Y. 361). In the first place, it should be noted that the applicable statute designates this as a *condemnation* procceding. This is quite different from mere *regulation.* Moreover, the city's street closing statute expressly provides for " Compensation and recompense *  *  * to the respective owners of the real property affected or damaged by reason of any such closing " (Administrative Code, § E15–3.0); it then defines real property as including: " *all* surface and *subsurface* structures *within closed streets* and *all easements and hereditaments,* corporeal or *incorporeal,* and every estate, interest and right, legal and equitable, in lands, *and every right, interest, privilege, easement and franchise relating to the same,* including terms for years and liens by way of judgment, mortgage or otherwise " (Administrative Code, § E15–1.0, subd. 5; emphasis supplied). It is obvious that this definition embraces the situation before us. Not only does it include incorporeal hereditaments, privileges, easements and franchises, but it also expressly refers to subsurface structures. It may be noted that by chapter 752 of the Laws of 1923, the 1895 street closing statute (L. 1895, ch. 1006) was amended, among other respects, to include specifically surface and subsurface structures and franchises. The predominant subsurface structures in the streets of New York City are of course these very utility installations, which increased in large measure in importance and value in the years before the present definition was added (see *Ghee* v. *Northern Union Gas Co.,* 158 N. Y. 510, 514 [1899]). The word " structure " is a general word depending upon context for its meaning (*Caddy* v. *Interborough R. T. Co.,* 195 N. Y. 415, 420) and aptly describes these installations. Moreover, it is interesting to note that when used in relation to the city of New York in subdivision 23 of section 2 of the Rapid Transit Law, the Legislature defined " Sub-surface structures " in such a way as to limit its meaning almost exclusively to pipes, mains and conduits.

In thus defining claimants' subsurface structures, consisting of mains and conduits, and the franchises under which they were laid, as real property, for which compensation must be made if

affected or damaged by the street closing, the statute merely follows the common law. In this State, it is settled that both the tangible property and the intangible right together constitute the estate created by special franchise (*New York Tel. Co. v. State of New York*, 169 App. Div. 310, 318, 321, affd. 218 N. Y. 738; *People ex rel. Barron v. Knapp*, 208 App. Div. 127, 130, affd. 239 N. Y. 581; *People ex rel. Metropolitan St. Ry. Co. v. State Bd. of Tax Comrs.*, 174 N. Y. 417, 441; *Syracuse Water Co. v. City of Syracuse*, 116 N. Y. 167). Such estate is an incorporeal hereditament, in the nature of an easement in the street wherein the installation is made (*Levy v. McClellan*, 196 N. Y. 178, 193–194; *Ghee v. Northern Union Gas Co., supra*; *United States v. 25.4 Acres of Land*, 65 F. Supp. 333, 71 F. Supp. 248, revd. on other grounds *sub nom. United States v. Brooklyn Union Gas Co.*, 168 F. 2d 391). This incorporeal hereditament is of course an interest in land constituting real property (Real Property Law, § 2; General Construction Law, § 40). We recognized these principles in *Ghee v. Northern Union Gas Co. (supra)* where we pointed out (p. 513) that the special franchise granted by the municipality vests in the recipient '' a perpetual and indefeasible interest in the land constituting the streets '', and in *Levy v. McClellan (supra)* where we said (pp. 193–194):

'' In the nature of incorporeal hereditaments, at common law, franchises partook of the nature of realty and these special franchises are inseparable from real property in their enjoyment. They fall, necessarily, into that one of the two general divisions of property made by the statute, which is described as real estate [referring to what is now Real Property Law, § 2] * * *

'' These franchises could never be classified as personal property ''.

It should also be noted that the statutes provide that, upon the opening of a street, land taken which is subject to an easement of this nature in favor of a utility company, such as are claimants here, must be taken subject to such easement (Administrative Code, § B15–39. 0). In this we find clear legislative recognition that the property in suit is an easement burdening the bed of the street, for how can the right be different in

nature merely because it arose by contract with the city, rather than with the city's predecessor in title?

While there are cases which seem to hold that this class of property should not be treated as real property, they dealt with special situations under the tax law, where the statute has always been regarded as special and specific in its definitions. Thus, in *People ex rel. Citizens' Gas-Light Co. of Brooklyn* v. *Board of Assessors of City of Brooklyn* (39 N. Y. 81, 87) we emphasized that "We must look to the statute instead of the common law, in determining whether these iron mains which run under the streets of the city are to be regarded for the purposes of taxation as real estate or not, as it is a matter of statute regulation entirely." It was then noted that the definition of real property contained in the statute was very limited, and did not (as here) include incorporeal hereditaments, or structures such as the main (cf. present Tax Law, § 2, subd. 6.)

From the foregoing, it follows that the formal closing of a street extinguishes the interest therein which inheres in the special franchise. That this is so appears from the fact that since 1895 such proceedings have been intended to extinguish all easements, both public and private (*Stirnweis* v. *Cacioppo*, 258 N. Y. 68; *Matter of City of New York* [*Newton Ave.*], 219 N. Y. 399, 406; *Barber* v. *Woolf*, 216 N. Y. 7; *Matter of City of New York* [*Grand Blvd.*], 212 N. Y. 538).

Even at common law, then, it would seem that the closing of a street would work a *pro tanto* destruction of claimants' easements and franchise rights for which compensation should be made (*New York Tel. Co.* v. *State of New York, supra; Rochester & Lake Ontario Water Co.* v. *City of Richester,* 176 N. Y. 36, 50; *Eighth Ave. Coach Corp.* v. *City of New York,* 286 N. Y. 84; *Matter of City of New York* [*E. 42nd St. Elev. R. R.*], 265 N. Y. 170; see, also, New York City Charter, § 363).

The rule as to relocation, referred to in such cases as *New York City Tunnel Authority* v. *Consolidated Edison Co.* (*supra*), has been applied in the past only to situations where there was truly *regulation,* rather than a *taking by condemnation.* In each such case the utility was required to relocate, but its rights in the particular street remained in being, the relocation therein being merely to accommodate some street improvement. When a street is closed, however, all rights therein are extinguished:

" When regulation becomes destruction, it ceases to be regulation " (*Eighth Ave. Coach Corp.* v. *City of New York, supra,* p. 94).

In any event, under the controlling statute, claimants are entitled to be compensated for their loss, and cases cited from other jurisdictions are not helpful here. Such loss has been properly measured not merely by the intrinsic value of the pipes and conduits in the soil, but by the actual loss to claimants of the right to unobstructed passage through the street in question. As we said in *People ex rel. Metropolitan St. Ry. Co.* v. *State Bd. of Tax Comrs.* (174 N. Y. 417, 441, *supra*), " Separate [the items of tangible property] from the franchise by taking away the street privilege, and they are destroyed."

For the foregoing reasons, we conclude that compensation has been properly granted to claimants (*City of Little Falls* v. *State of New York,* 198 App. Div. 488; *City of New York* v. *New York Tel. Co.,* 278 N. Y. 9, *supra; United States* v. *25.4 Acres of Land,* 71 F. Supp. 255, 258, affd. *sub nom. United States* v. *City of New York,* 168 F. 2d 387), and upon this record no serious question is presented as to the amount.

As to Brooklyn Union's appeal from the order of the Appellate Division insofar as it affirms that part of the final decree which failed to make an award for the six-inch main and its appurtenances not relocated, we are also of the opinion that upon this record the courts below must be affirmed. Brooklyn Union did not ask for any compensation for the twenty-inch main that was left in the street, but only for reconstruction costs, which were allowed. This reconstruction, it would appear, fulfilled all the requirements by way of replacement of its installations in Gillen Place. The trial court had the right to deem the six-inch main " antiquated " and abandoned and of no value, and, since it was not relocated, its failure to make an award cannot be said to have been unjustified.

The order should be affirmed, with costs to respondent Consolidated Edison Company of New York, Inc., against the City of New York.

Fuld, J. (dissenting). The present proceeding was brought by the City of New York to close and acquire title to Gillen Place, a public street in the Borough of Brooklyn, preparatory

to releasing the land occupied thereby to the Board of Transportation for the purpose of erecting a bus repair shop and garage. It consequently became necessary for the Brooklyn Union Gas Company and the Consolidated Edison Company of New York, claimants herein, to replace and relocate most of the mains, pipes, wires and other installations that they had been maintaining below the street surface. For the expenses thereby incurred, the courts below granted compensation, and the city appeals from those determinations. In addition, the gas company appeals from the refusal below to allow it compensation for a section of pipe which the company chose not to relocate or remove because it had become obsolete.

The procedure for closing the street was conducted in accordance with the " Street Closing Act " (L. 1895, ch. 1006; L. 1923, ch. 752), as embodied in the Administrative Code of the City of New York (§ E15–1.0 *et seq.*). Preparatory to closing Gillen Place, the city's planning commission held a hearing on the proposed change of the city map — the essential preliminary step — and concluded that the change should be approved as " an element in the formal process of closing and discontinuing an unnecessary street in order that the street area and the abutting City-owned property may be consolidated to permit expansion of City transit storage and repair facilities." There was no opposition.

The present proceeding was thereupon commenced by the city to accomplish the closing and to obtain title to the bed of the street. Both these purposes are comprehended by the street closing law which provides that the city may " authorize the closing or discontinuance of such streets therein, in whole or in part, as it may be deemed necessary in order to more effectually secure and preserve the regularity and uniformity of the streets therein, or where other public necessity requires the closing or discontinuance of such streets " and also " acquire the fee title to lands within closed streets   *   *   *   whenever it may deem that such acquisition will more effectually secure the actual discontinuance and closing of streets which may be legally discontinued and closed pursuant to this title, or when other public necessity requires the acquisition thereof." (N. Y. C. Administrative Code, § E15–3.0.)

The holdings of the courts below that claimants were entitled to be paid the cost of relocation of their facilities resulted, it seems to me, from a failure to differentiate the two separate steps involved in these proceedings. The closing of the street terminated the privilege of the utility companies to continue their facilities, since that privilege stemmed solely from the fact that they were located in a street. The city had theretofore only an easement in the land for street uses, and the mains and pipes were laid under the surface only as part of the street use. If the street had been surrendered to the owner of the bed of the street — rather than acquired in fee, as here — there could be no question that the owner would have been under no duty to compensate the companies and could have required them to remove their property. (See, e.g., *New York Central R. R. Co.* v. *Westchester Lighting Co.*, 226 App. Div. 825, 826.) The removal was the consequence of the discontinuance, and could give rise to no claim for damage. The simultaneous acquisition of the fee did not create a claim where none had before existed. From the standpoint of claimants, it was immaterial whether the title was acquired simultaneously or weeks or months later, and equally immaterial the use to which the land occupied by the street was to be put. Their right to continued use of the subsurface of the former street was gone, and the taking did not deprive them of any right or add any element of injury.

And, in line with such principles and with such reasoning, the courts of other jurisdictions have held — without considering the use to which the land was to be put — that the displaced utility must bear all costs of relocation. (See *New England Tel. & Tel. Co.* v. *Boston Term. Co.*, 182 Mass. 397; *Northern Ind. Gas & Elec. Co.* v. *Merchants Improvement Assn.*, 87 Ind. App. 74; *Central Dist. & Print. Tel. Co.* v. *Pittsburgh, M. & Y. R. R. Co.*, 55 Pa. Super. Ct. 237; cf. *Taylor* v. *Portsmouth K. & Y. St. Ry.*, 91 Me. 193, 198.) Thus, in *New England Tel. & Tel. Co.* v. *Boston Term. Co.* (*supra,* 182 Mass. 397) — a case very like the one now before us — several public streets were discontinued, and the land in the bed thereof appropriated for the site of a railroad terminal station. As in the present case, several utility companies claimed compensation for the enforced removal of their underground facilities from the closed streets. In denying the claim, the court held that

the utility companies " have no rights of property in the street, and their structures that were built therein were personal property which they had a right to remove, and which could not be subjects for the assessment of damages" under the applicable statutes (182 Mass., at p. 400). That conclusion followed, the court declared, from the character of the user which a public utility enjoys in the public streets (pp. 399, 401): " The permanent structures [of a utility company] * * * are permitted [in the public streets] because they are used by the public or a part of the public, or are held and used in private ownership for the benefit of the public. The rights in the streets which are so exercised or enjoyed are not private rights of property, but are a part of the public rights which are shared in common, although used and enjoyed in different ways by the different members of the public who pass through a street, or whose property is carried through it. [p. 399] * * * these public rights, being subject to the control of the Legislature, were terminated by the * * * [statute] which provided for the discontinuance of the streets, and a taking by the respondent. When these places ceased to be public streets, all rights of the public in them came to an end * * * The action taken by the respondent under the statute first worked a discontinuance of the streets, and then appropriated them to the public use for a terminal station. The damages to be assessed were only for rights of property in the real estate at the time of the taking. * * * the petitioners had no such rights. [p. 401] "

An Indiana court likewise denied a public utility's claim—asserted against the fee owner of the land in a closed street—to damages for the cost of the removal of its poles and wires necessitated by the closing (*Northern Ind. Gas & Elec. Co.* v. *Merchants Improvement Assn., supra,* 87 Ind. App. 74, 77): " Any member of the public conveying his products to his customers had the same right to use the alley that appellant had, and appellant was no more entitled to compensation for removing its personal property from the location when it ceased to be a public place than was any other public user who was excluded therefrom by reason of such vacation."

It is, however, here contended that the proposed use of the street for the benefit of the transportation system is such a

deviation from the primary purpose of securing the " regularity and uniformity of the streets " as to make this a nongovernmental objective and to require payment of compensation by the city. This contention is based on a faulty analogy with cases involving relocation *within* streets brought about by the construction or operation of the city's subways. It is well settled that, where the city makes changes in existing streets for ordinary public purposes, the companies must relocate their facilities at their own expense to accommodate them to such changes. (See *Consolidated Edison Co.* v. *State of New York,* 302 N. Y. 711; *New York City Tunnel Authority* v. *Consolidated Edison Co.,* 295 N. Y. 467; *Matter of Town of Cheektowaga Grade Crossings,* 283 N. Y. 687; *Transit Comm.* v. *Long Island R. R. Co.* [*Bell Ave.* case], 253 N. Y. 345; *Chace Trucking Co.* v. *Richmond Light & R. R. Co.,* 225 N. Y. 435, 437; *Matter of Deering,* 93 N. Y. 361.) It is equally well settled that, where one utility company requires use of the street which necessitates changes by other utility companies, the last-comer must bear the expense of relocation. (See, e. g., *Postal Tel.-Cable Co.* v. *Depew & Lancaster Light, Power & Conduit Co.,* 251 N. Y. 562.) In between these extremes fell the case where the change was necessitated by construction of a subway by the city rather than by a private corporation, and the conclusion was reached that for the purpose at hand the city should be regarded as an operator of a utility enterprise. (See *City of New York* v. *New York Tel. Co.,* 278 N. Y. 9; cf. *New York & Queens Elec. Light & Power Co.* v. *City of New York,* 221 App. Div. 544.) That ruling, however, always recognized as exceptional in imposing liability on the municipality, has been, and should be, narrowly confined. (See *Consolidated Edison Co.* v. *State of New York, supra,* 302 N. Y. 711.) To apply it here would be to extend the exception beyond its justification. This is not a case of competing street uses; it is a case of discontinuing what has authoritatively been found to be an " unnecessary street ", and the termination of occupancy flowed as a matter of course from that decision. The discontinuance was for a public purpose in the traditional sense, for it should always be the purpose of officials to avoid unnecessary expenditure in maintaining unneeded streets. If the area had been returned to private ownership in order to restore it to the tax rolls, that too would

be a legitimate instance of " other public necessity " justifying the discontinuance of this street. Even if the determination could be collaterally attacked, it would be only on the ground that the street should not be closed, whereas, by the very claim of compensation here asserted, the propriety of the closing itself is necessarily conceded.

An alternative ground urged by claimants is that the statute expressly provides for such payment.

It may be conceded that the legislature could have required such payment as a condition for the discontinuance of streets. But that it would do so, that it would require such payment is exceedingly doubtful. Claimant utilities had no interest in the bed of the street. Their occupancy was merely derivative from the former street use. They were not abutting owners, and therefore contributed nothing either to the cost of acquisition of the street or to its maintenance. It is difficult to see the basis on which the city should compensate the occupant for the loss of a privilege which was obtained and maintained entirely without cost or expense. In my opinion, the statute, when reasonably construed in its context, makes no such provision. As already noted, the statute provides that the city, in addition to closing the street, " may acquire the fee title to lands within closed streets ". This is an ordinary condemnation proceeding. The statute requires payment for real property taken or damaged. But here there was no property of claimants taken or damaged. The city did not want the wires, pipes, mains and the like, and it did not specify them as property to be taken. Nor did the city damage this property. It is true that it became necessary for claimants to remove their property, but that, as already pointed out, was a consequence of the closing of the street, not of the acquisition of the " fee title to lands within closed streets ".

In point of fact, claimants did not own any real property affected by the acquisition of title to the bed of the street. It is true that real property is here defined as including " all surface and subsurface structures within closed streets and all easements and hereditaments, corporeal or incorporeal, and every estate, interest and right, legal and equitable, in lands, and every right, interest, privilege, easement and franchise relating to the same, including terms for years and liens by way of judgment, mortgage or otherwise " (N. Y. C. Administrative Code,

§ E15–1.0, subd. 5). However, this is customary language when dealing comprehensively with interests in real property for the purpose of assuring complete title. It does not create an interest in land where none previously existed. It is well settled that, in the absence of statute, the installations of public utilities retain their character as personal property. (See *Matter of City of New York [Fort Greene Houses]*, 291 N. Y. 788; *People ex rel. Western Union Tel. Co.* v. *Dolan*, 126 N. Y. 166, 175–176; *People ex rel. Citizens' Gas-Light Co. of Brooklyn* v. *Board of Assessors of City of Brooklyn*, 39 N. Y. 81, 87; *People ex rel. New York Edison Co.* v. *Feitner*, 99 App. Div. 274, affd. 181 N. Y. 549.) The quoted definition was not intended to encompass more than that traditionally regarded as real property. If the legislature had intended to include the pipes, mains and wires of public utilities, specific language was at hand to make that meaning clear. Thus, '' real property '' as defined in subdivision 6 of section 2 of the Tax Law, includes '' structures, substructures and superstructures, erected upon, under or above, or affixed to the [land] '', *and* '' all mains, pipes and tanks laid or placed in, upon, above or under any public or private street or place for conducting steam, heat, water, oil, electricity or any property, substance or product capable of transportation or conveyance therein ''. The legislature evidently considered the former clause inadequate to accomplish the purpose of rendering the installations of public utility companies taxable as real estate, and it is my opinion that the almost identical language of the definition section of the street closing law is similarly inadequate to require the city to compensate utilities for the value of their installations where no such liability exists at common law. Absent unambiguous language, similar to that employed in the Tax Law, we cannot assume that the legislature intended to thrust upon the city a liability from which, as we have seen, it is traditionally exempt.

Moreover, strictly speaking, the question is, not whether the franchise together with the use may be considered to be an interest in land, but whether the facilities in the bed of the street represent an interest in land after the right to maintain them is gone. The general franchise to use all streets, which these claimants possessed by reason of their charters and applicable

legislation, of course continued unaffected by reason of this street closing, and it was in accordance therewith that these facilities were relocated in other streets. However, the right to use this particular area was terminated by the discontinuance of the street and thereafter the claimants had merely the right, which they exercised, to remove their property to another public street.

I would, therefore, reverse so much of the order appealed from as grants compensation to claimants.

LOUGHRAN, Ch. J., LEWIS, CONWAY and DYE, JJ., concur with FROESSEL, J.; FULD, J., dissents in opinion in which DESMOND, J., concurs.

Order affirmed, etc.