In the Matter of CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Respondent, v. JOHN V. LINDSAY et al., Constituting the Board of Estimate of the City of New York, et al., Appellants. (No. 13373.)

In the Matter of the CITY OF NEW YORK, Respondent, Relative to Acquiring Title to Certain Real Property Bounded by Union Avenue and Other Streets, as a Site for Public School 161, in the Borough of The Bronx. CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Appellant. (No. 13374.)

First Department, July 16, 1968.

*Morris Einhorn* of counsel (*Morris Handel* with him on the brief; *J. Lee Rankin, Corporation Counsel*), for appellants and respondent.

*Joy Tannian* of counsel (*John M. Keegan,* attorney), for respondent and appellant.

STEVENS, J. P. These appeals, while factually distinguishable, involve a common question of law and for convenience will be discussed together.

With respect to Appeal No. 13373, on or about November 2, 1964, an order was entered condemning certain real property under title B of chapter 15 of the Administrative Code of the City of New York for a contemplated urban renewal project. The land so taken involved the closing or discontinuance of certain named streets. The petitioner, Consolidated Edison Company of New York, Inc. (Con Ed), by order to show cause instituted an article 78 proceeding in the nature of mandamus to compel respondents-appellants (hereafter City) to perform certain duties allegedly enjoined upon City by virtue of title E of chapter 15 of the Administrative Code of the City of New York (the Code). Con Ed alleged it was the owner of certain franchises in the streets and area taken and that there had been a failure to institute the requisite statutory compensation proceeding. Con Ed had not received any order directing removal of its structures.

In Appeal No. 13373 City appeals from an order entered June 1, 1967, denying its cross motion to dismiss the petition pursuant to CPLR 7804 (subd. [f]) (that the petition is insufficient as a matter of law), and which granted petitioner's application and directed City to comply with the mandate of subdivision 4 of section E15-4.0, and with the mandate of title E of chapter 15 of the Code by instituting a proceeding to determine compensation justly to be made to owners of realty affected by the

closing of certain named streets. We note although City in its motion papers did not request leave to answer in the event its motion was denied, yet such permission should have been granted by reason of the mandatory language of CPLR 7804 (subd. [f]) under which the motion was made. However, we may and do take judicial notice of the necessary facts as set forth in official resolutions and official proceedings.

For reasons hereinafter stated the order appealed from should be affirmed.

In Appeal No. 13374 Con Ed appeals from an order of possession and judgment entered April 24, 1967, which granted City's motion to direct the removal of Con Ed's facilities from the bed of a portion of East 151st Street, Bronx, and which denied Con Ed's cross motion made pursuant to article 78 of the CPLR for a judgment directing petitioner City to complete a street condemnation proceeding pursuant to title E of chapter 15 of the Code. The realty here condemned, including the closing of a portion of East 151st Street, was for the purpose of constructing a public school, and the proceeding by City was also taken pursuant to title B of chapter 15 of the Code. Prior to the instant proceeding Con Ed had not been served with any notice or document relating to the relief sought by the City.

Both appeals involve the closing or discontinuance of a street or streets for a public purpose. In each instance Con Ed possessed a franchise pursuant to which it owned and operated certain utility facilities in the streets closed.

The question common to both appeals is whether a proceeding under title B of chapter 15 is sufficient to extinguish rights of owners of real property affected by a street closing in condemnation. All references hereafter are to chapter 15 of the Code unless otherwise indicated.

Title E of chapter 15 of the Code, entitled "Street Closing Condemnation Procedure" defines "owner" as a "person having an estate, interest or easement or lien, charge or encumbrance on any real property affected by proceedings under this title." (§ E15–1.0, subd. 3). Real property is defined to include surface and subsurface structures in closed streets, easements, corporeal and incorporeal hereditaments, franchises, legal or equitable right, etc., in lands (subd. 5). Clearly Con Ed has status as an owner affected.

City has full authority to close or discontinue any street in whole or in part "as it may be deemed necessary" in order to more effectively secure and preserve the "regularity and uniformity of the streets therein, or where other public necessity requires the closing" (Code, § E15–3.0). Such closing shall be

effected as a capital project. "Compensation or recompense shall be made" to the owners of the real property affected or damaged by the closing (§ E15–3.0, subd. b).

Title B of chapter 15 of the Code is entitled "Consolidated Condemnation Procedure." The definition of "real property" under this title parallels somewhat that under title E, but makes no reference to "surface or subsurface structures within closed streets." As under title E, a proceeding under title B is a capital project proceeding (Code, § B15–1.0, subd. 8). The provisions of title B "shall apply to all capital project proceedings instituted within the city unless the context or subject-matter otherwise requires, *but shall not apply to street closing proceedings,* except as provided in section E15–29.0 of the code" (Code, § B15–2.0; emphasis added). Section E15–29.0 dealing with the purchase of awards has no relevancy here and needs no discussion.

Since taxpayers' money is involved both in the construction of the urban renewal project and the public school it may reasonably be concluded that such projects would not be undertaken unless the necessity therefor was both public and evident. Included in the land condemned for the capital project are certain public streets which were closed. In such streets lay "real property" owned by Con Ed (see Code, § E15–1.0, subd. 5). If a proceeding under title B is sufficient as well to extinguish the rights of owners of real property affected by street closings in condemnation, then the owners of such property are deprived of the same without any opportunity to be heard on the issue of compensation or recompense. Title E in its application would not embrace "public necessity", as therein provided, but would effectively be restricted to the more limited purpose "to more effectually secure and preserve the regularity and uniformity of the streets" (Code, § E15–3.0). This could hardly have been intended in light of the general purpose to provide a method whereby in a taking resulting from a street closing, the owner affected should be given opportunity to make claim for compensation to which he might feel entitled. We have to assume that every provision of the Code was intended for some useful purpose (see McKinney's Cons. Laws of N. Y., Book 1, Statutes, § 144). It should be noted also that street closings are specifically excluded from the operation of the provisions of the Consolidated Condemnation Procedure set forth in title B of chapter 15. Rights of owners affected by a street closing, though embraced within a larger area of condemnation, should not be deemed extinguished thereby and such owners foreclosed from making appropriate claim. Nor did

the proceedings taken by City assume to appropriate the easements and franchises of Con Ed in the streets involved in the condemnation, therefore Con Ed had no opportunity to advance its claim for compensation (cf. *Matter of City of New York (Fort Greene Houses)*, 291 N. Y. 788), and its right to compensation, if any, and in what amount, should not now be determined.

In *Matter of City of New York (Gillen Place)* (304 N. Y. 215) a proceeding under title E of chapter 15 of the Code, where the City was closing a street and appropriating the property for the building of a bus garage, a proprietary function, the court noted that when the change is required " in behalf of municipalities exercising a proprietary instead of a governmental function the common-law rule that utilities maintain their installations in public streets subject to the risk of relocating them at their own expense when public necessity so requires, does not apply " (p. 221). The court made this observation " assuming, however, that the street closing proceeding was instituted to secure uniformity of the city street system, in the exercise of governmental power, still by reason of the statute claimants are not bound by the common-law rule " (p. 221). In the cases on appeal, as in the *Gillen case (supra)*, the estate created by Con Ed's special franchise consists of its tangible property plus the intangible right. And such estate " is an incorporeal hereditament, in the nature of an easement in the street wherein the installment is made " (p. 223). Under the statute if Con Ed's real property (§ E15–1.0, subd. 5) is affected or damaged by reason of the closing it shall be afforded the opportunity to make claim for and to receive compensation (§ E15–3.0, subd. b) as construed in *Matter of City of New York (Gillen Place) (supra)*. It would seem that title E abrogated the common-law rule excusing payment by the sovereign when the taking is for a governmental function.

In *New York Tel. Co. v. City of Binghamton* (18 N Y 2d 152) submitted on an agreed statement of facts, the court said in order " to decide this case it is not necessary to uphold or reject *Matter of City of New York (Gillen Place)* " (p. 159). The court determined the plaintiff was not entitled to reimbursement for the expense of relocating its lines and facilities as a result of the closing of a street and the using of such section as part of a housing project (later conveyed by the defendant to a private concern for development) as this was a governmental function. It does not appear that City of Binghamton had a statute similar to or identical with title E of chapter 15 of the

Code, nor that a construction of title E of chapter 15 was involved.

In the cases on appeal a condemnation, not a mere regulation or relocation, is involved. The City should comply with the requirements of the statute as set forth in subdivision 4 of section E15–4.0 of the Code, and other applicable provisions of title E of chapter 15 of such Code (see, also, § E15–11.0). The trial court has the power to determine all questions of title and right to damages (§ E15–14.0, subd. b).

Accordingly, in Appeal No. 13373, the judgment appealed from should be affirmed, with costs and disbursements.

The order of possession and judgment (one paper) appealed from in Appeal No. 13374 should be reversed on the law, with costs and disbursements, the judgment vacated and the City directed to comply with the applicable mandates of title E of chapter 15 of the Administrative Code, particularly with respect to the institution of compensation proceedings.

In *Matter of Consolidated Edison Company* v. *John V. Lindsay.*

Tilzer, J. (dissenting). Pursuant to execution of an urban renewal plan by the legislative bodies of the City of New York known as the Brooklyn Bridge Southwest Urban Renewal Plan, an order was entered on November 2, 1964 condemning the real property under title B of chapter 15 of the Administrative Code of the City of New York and the city acquired fee title to the subject streets. (Opinion of the court below at Special Term.) Fee title to the streets, nevertheless, the Special Term held, did not extinguish the petitioner utility's property interests located in such streets since the Legislature had by local statute (Administrative Code, ch. 15, tit. E, Street Closing Condemnation Procedure) abrogated the common-law rule and granted to a public utility compensation for the damages it sustained.

We disagree. The petitioner acquired no exclusive right to the location of its facilities in the streets chosen by it and it must relocate its structures at its own cost when public convenience and security so require. The sole exception to this common-law rule occurs when the police power over the regulation of streets is invoked for a proprietary function, that is, to compete with a utility by performing a public utility service.

As to the project under review, the Court of Appeals said of a similar exercise of the police power undertaken pursuant to the same General Municipal Law and title 1 of the National Housing Act of 1949, " it is much too late now to decide that slum elimination is not a ' governmental function ' ''. (*New York Tel. Co.* v. *City of Binghamton,* 18 N Y 2d 152, 161.)

The common-law rule, moreover, is not abrogated by the provisions of a local statute governing isolated instances of street closings. The General Municipal Law under which Brooklyn Bridge Southwest Urban Renewal Plan was declared eligible as an area "detrimental and a menace to the safety, health and welfare of the inhabitants and users thereof and of the Locality at large," makes no provision for a departure from the common-law rule. On the contrary, the Legislature expressly provided that "the provisions of this article shall be controlling" and shall supersede "the provisions of any other general, special or local law" that are "inconsistent with * * * the provisions of this article" (General Municipal Law, § 520). Furthermore, the departure or exception to the common-law rule applicable when the municipality is exercising a proprietary function is not to be stretched "to apply it in cases like this where the city is not ' going into business ' for itself, as it does when it operates a bus line or subway system." (*New York Tel. Co.* v. *City of Binghamton, supra,* p. 160.)

*Matter of City of New York (Gillen Place)* (304 N. Y. 215), upon which the Special Term relied as authority for an order in the nature of mandamus to compel the appellants to compensate petitioner for its property in closed streets, is to be limited to its own facts and to its special holding "that when the city chooses to operate what are commonly called ' public utility ' businesses the city's operation thereof has no such priority over privately owned utility companies as to subject the latter to compulsory removal of their facilities without compensation in aid of the municipal operation." (*New York Tel. Co.* v. *City of Binghamton, supra,* p. 159.) *Gillen Place* is authority solely for the exception to the common-law rule, that is, that there "there was a condemnation proceeding to enable New York City to perform a *proprietary* function." (*New Rochelle Water Co.* v. *State of New York,* 10 N Y 2d 287, 292; emphasis in original.)

The Special Term's reliance upon *Matter of City New York (Fort Greene Houses)* (177 Misc. 101, affd. 266 App. Div. 795, affd. 291 N. Y. 788) is also misplaced. In that case, involving the acquisition of real property for a low-cost housing project, the court noted that the order of condemnation left undisturbed the public easements in the streets and reasoned that there was "no intention to acquire in this proceeding the interest, if any, of the utility companies, within the street areas." (p. 103). In concluding that the utility company claimants were not entitled to damages, the court commented (p. 102): "In none of the many condemnation proceedings tried by this court has

any similar claim ever been advanced by the utility companies and in no case that they cite have they been held entitled to damages in condemnation for their franchises or the equipment they maintain in New York city streets. In fact, they fail to show that they ever paid the city, either by way of benefit assessment or otherwise, for any real estate interest in streets which the city acquires in trust for the public." As indicated, *Fort Greene Houses* was affirmed by the Appellate Division, Second Department. One of the Justices, HAGARTY, J., dissented, stating that there was " clear and undisputed proof that the affected streets were to be discontinued and, in fact, have been obliterated by buildings permanently erected on and over them." (p. 797). The Court of Appeals affirmed (291 N. Y. 788).

No " compelling considerations of constitutional right " (*New York Tel. Co.* v. *City of Binghamton, supra,* pp. 159-160) are presented which mandate an exception to the common-law rule. If the petitioner has not recaptured its investment in its property via depreciation rates, it may recover its costs as part of the cost of rendering its services. And in any event, resurrecting a blighted portion of petitioner's monopoly area of service enhances its future prospects and enables it to exercise unimpaired its full franchise rights in the urban renewal area.

The petitioner's property right in the streets of the city is but a mere privilege and any injury sustained by it in relocating its facilities as a result of a sovereign function is *damnum absque injuria.*

The order should be reversed and the appellants' cross motion granted dismissing the petition as a matter of law.

In *Matter of City of New York (Consolidated Edison Co. of N. Y.)*

TILZER, J. (dissenting). I dissent and vote to affirm on the opinion of the Special Term; see, too, my dissenting opinion in the companion Appeal, No. 13373, between the same parties.

EAGER, STEUER and MACKEN, JJ., concur with STEVENS, J. P.; TILZER J., dissents in opinions.

Judgment affirmed with $50 costs and disbursements to the respondent. (No. 13373.)

Order and judgment (one paper) reversed, on the law, with $50 costs and disbursements to the appellant, the judgment vacated and the City directed to comply with the applicable mandates of title E of chapter 15 of the Administrative Code, particularly with respect to the institution of compensation proceedings. (No. 13374.)