Burke, J.
This is an appeal from a judgment declaring valid a proposition adopted on May 15, 1951, at a special town meeting of Huntington, Suffolk County, Long Island, reading as follows:
‘ ‘ PROPOSITION" HUMBER OHE
Shall the action of the Supervisor, Justices of the Peace and Town Clerk of the Town of Huntington in acquiring for the town in the name of the Board of Trustees the 22 acre beach and park at Centerport, the various lots comprising the recreation fields in G-reenlawn, East Northport and Huntington Station, the several parking lots in Huntington Village, Huntington Station and East Northport and the Gerard Street Extension; and in improving and maintaining the same; and in contracting with the U. S. Dredging Corp. for the dredging of Huntington’s harbors and bays and using the revenues therefrom for the foregoing purposes, be approved? ”
The proposition dealt with three projects: the acquisition of the beach property at Centerport, the making of lease-purchase agreements for the acquirement of parking areas and recreation fields in various parts of the town, and contracts made with the U. S. Dredging Corp. for the sale and disposal of gravel and sand and for the dredging of Huntington Bay and Harbor. In the Town of Huntington, there are two boards, the town board and the board of trustees. The town clerk is not a member of the town board. The supervisor, justices of the peace and the town clerk constitute the board of trustees of the Town of *218 Huntingdon. The two boards are separate and distinct, maintaining separate books and records. All of these transactions were entered into in the name of the board of trustees of the Town of Huntington.
The complaint alleges that all the acts, transactions and contracts mentioned in Proposition No. 1 were the acts of the board of trustees of the Town of Huntington made and performed, under the claims, that the board of trustees is separate and apart from the town board, and that the board of trustees is not controlled by the laws, rules and regulations affecting the town board and that such transactions do not require prior authorization. The plaintiffs sought an adjudication and judgment declaring invalid and void (1) a resolution adopted by the town board at a special meeting directing the holding of a special election to vote on Proposition No. 1, and (2) the proposition as approved at the special election.
The preliminary question before us then is to decide whether the board of trustees truly possessed the power to enter into such contracts free from the restraints of the provisions of the Town Law, which requires a resolution of the town board and the approval of the qualified electors to engage in certain town improvements. If the answer is in the affirmative, the issue of the validity of Proposition No. 1 need not be considered. For if these contracts were proprietary in nature they did not require prior authorization or subsequent approval of the electors as will be discussed hereafter. In that event the adoption of the resolution by the town board was needless. But if any of the circumstances surrounding the making or performing of the contracts as distinguished from the right to enter into the contracts, were illegal or corrupt, such transgressions may be redressed in a different action or proceeding.
On the application for leave to appeal and on the appeal, references were made to chapter 816 of the Laws of 1952 entitled “ An act to ratify and confirm the title of the trustees of the town of Huntington, Suffolk county, in and to certain lands therein and to ratify and confirm the acts of its board of trustees, and defining the powers and duties of such board ”. We decided that we might be obliged to apply chapter 816 of the Laws of 1952 in whatever manner it related to the present controversy. We, therefore, ordered a reargument to ascertain whether chapter 816 of the Laws of 1952 renders the town *219 board resolution and Proposition No. 1 academic (308 N. Y. 1021). There is no real controversy over the proposition if the statute makes prior authorization or ratification by a town election unnecessary.
Chapter 816 of the Laws of 1952 was enacted after this action was tried and the proposition approved by the voters. The memorandum submitted in support of the bill, letters from the Comptroller and Attorney-General, and communications in opposition and in support of the proposed legislation, all contained in the files of the Legislature, made it clear to the Legislature and the Governor that the purpose of the legislation was to define, clarify, confirm and ratify the powers of this board of trustees for the reason that the rights of the trustees to exercise certain powers were being challenged in current controversies, including this very action. With the intent and purpose of the bill completely revealed, the Legislature passed it and the Governor approved it. Therefore, chapter 816 of the Laws of 1952 is applicable to the present issue.
. Moreover, we are required to decide on the basis of the law as it exists at the time of our decision (Matter of Tartaglia v. McLaughlin, 297 N. Y. 419; People ex rel. Clark v. Gilchrist, 243 N. Y. 173, 180), hence chapter 816 of the Laws of 1952 is before us. This statute reads as follows:
[1] ‘ Aw act to ratify' and confirm the title of the trustees of the town of Huntington, Suffolk county, in and to certain lands therein and to ratify and confirm the acts of its board of trustees, and defining the powers and duties of such board
# * *
“ Section 1. Legal title is hereby ratified and confirmed in the Board of Trustees of the Town of Huntington as successor to the Trustees of the Freeholders and Commonalty of the Town of Huntington under Chapter 492 of the laws of 1872 as amended by Chapter 101 of the Laws of 1929, to all lands described in the Governor Nicholls Patent recorded in Book No. 1 of Patents at Page 73, in the Governor Pongan Patent recorded in Book No. 6 of Patents at Page 338 and in the Governor Fletcher Patent recorded in Book No. 6 of Patents at Page 493, all in the office of the Secretary of State.
“ § 2. The powers to acquire, hold, manage, lease, control, convey, grant and dispose of property both real and personal for the benefit of the residents and taxpayers of the Town of *220 Huntington heretofore exercised by said Board of Trustees of the town of Huntington and/or its predecessors, are hereby ratified and confirmed in said Board of Trustees and said Board of Trustees is hereby authorized and empowered to continue to hold, manage, lease, convey, grant, invest and reinvest such property and funds as Trustee for the residents and taxpayers of the Town of Huntington, and in furtherance of its said trust to acquire in its own name by gift, purchase or lease and to maintain and improve property of any nature either real or personal, for the benefit of the residents and taxpayers of the Town of Huntington.
“ § 3. All acts heretofore taken by said Board of Trustees in the exercise of the aforesaid powers are hereby legalized and confirmed and made effectual and valid as the official acts of said Board of Trustees.
“§ 4. Except as therein otherwise specifically provided, the provisions of the town law, shall not apply to the acts of said Board of Trustees, and such acts shall be subject to review by the Supreme Court under the provisions of Article 79 of the Civil Practice Act of the State of New York. Such trust is hereby declared to be an express trust within the meaning of Section 1307 of the Civil Practice Act.
“ § 5. If any clause, sentence, paragraph or part of this enactment or the application thereof to any person or circumstances, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder, and the application thereof to other persons or circumstances, but shall be confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgment shall have been rendered, and to the person or circumstances involved. It is hereby declared to be the legislative intent that this enactment would have been adopted had such invalid provisions not been included therein.
“ § 6. This act shall take effect immediately.”
The plaintiffs contend first, that the board of trustees has arrogated to itself and usurped the powers of the town board, second, that the acts, whether considered acts of the trustees or town board, must be approved at town elections, and third, chapter 816 of the Laws of 1952 is unconstitutional and void.
*221 In order to determine the validity of these challenges, it is appropriate to turn to an examination of the powers and duties of the town trustees as historically conceived, altered and exercised. In this manner we will be able to determine whether they exceeded their normal limitations in entering into the aforementioned agreements. Also, we will be aided in determining the scope of the 1952 enactment and whether it contains any innovations which are repugnant constitutionally or otherwise.
By three separate grants of Colonial Governors of New York, certain uplands and lands under Huntington Harbor and Huntington Bay were given to the trustees of the freeholders and commonalty of the Town of Huntington, who were thereby created a corporate body. They were given the express powers necessary to manage and preserve the trust estate. These grants were confirmed in the first Constitution of the new State of New York and in all subsequent Constitutions. Such grants were recognized by this court in Trustees of Brookhaven v. Strong (60 N. Y. 56).
The New York Constitution of 1777 confirmed and ratified the proprietary and governmental powers in the trustees “ until otherwise directed by the legislature ’ ’.
The Constitution thus entrusted the Legislatures with the authority of preserving boards of trustees or abolishing them, of creating towns and town boards, with specified powers, or abolishing them, of enlarging or curtailing powers granted to towns and town boards or to boards of trustees.
Insofar as composition is concerned, the trustees continued to function as originally constituted until 1872. In that year the Legislature provided that the supervisor and assessors of the town, together with the town clerk, should constitute, ex officio, the board of trustees of the Town of Huntington, replacing the trustees of the freeholders and commonalty of the town. This new body was vested “ with all the rights, privileges, powers, duties and jurisdiction heretofore enjoyed or exercised by such trustees, over the real and personal property of the town of Huntington.” (L. 1872, ch. 492.)
The new body continued to function in the same manner as the old one until 1929, when a further change was made necessary by the abolition of the office of town assessor. By chapter 101 of the Laws of 1929 the supervisor and the justices of the peace of the town, constituting the new town board, were made, together with *222 the town clerk, ex officio, the board of trustees of the Town of Huntington, with all the powers' of their predecessors. The town board and the board of trustees have continued to date to operate as separate and independent bodies. No legislative act has merged them'or reduced the original proprietary powers of the trustees.
On the contrary, by the acts referred to and other acts, the Legislature has recognized their independent existence. For example, in 1888, it ceded to the trustees of the Town of Huntington, all right, title and interest which the People of the State of New York had, if any, in the lands “ outside of and beyond low water mark under the waters of Huntington bay, in the town of Huntington * * * for the purpose of oyster cultivation ” by chapter 279 of the Laws of that year.
A careful examination of the decisions, statutes and public records compel us to conclude that chapter 816 of the Laws of 1952 merely ratifies, confirms and defines pre-existing powers of this board of trustees, powers which the Legislature has given to boards of trustees in general. The Legislature in confirming the powers in this board of trustees was reciting powers which have been granted to and exercised by the board of trustees of Southampton and other towns under similar grants and legislative enactments. Although the wisdom of continuing the coexistence of a dual political system is open to question, this court has not substituted and cannot substitute its judgment in the place of the judgment of the Legislature.
Indeed this court has frequently recognized trustees created by colonial patents. (Trustees of Brookhaven v. Strong, 60 N. Y. 56, supra; Trustees of Southampton v. Jessup, 162 N. Y. 122; Tiffany v. Town of Oyster Bay, 209 N. Y. 1; Town of Islip v. Estates of Havemeyer Point, 224 N. Y. 449.)
The words and phrases denoting the powers of the trustees used in the legislative acts, grants and the decisions are synonymous with, if not identical to, the words and phrases used in chapter 816 of the Laws of 1952. The physical characteristics of the lands and their use and occupation by the public and the trustees for the public, as described in the opinions of the courts, show that they were utilized for purposes which resemble and even correspond exactly to the purposes for which the projects described in Proposition No. 1 were designed. In Beers v. Hotchkiss (256 N. Y. 41, 58-59), the court said:
*223 ‘ ‘ What was enacted as to the town allotments was merely an incidental feature of a comprehensive statute embracing other subjects. There was surely no purpose by the repeal to overturn or unsettle titles of immemorial acceptance. Confirmation of anything so fundamental must have been felt to be a mere formality. The final arbiter was usage. Doctrine had not established itself sufficiently to be superior to practice. To learn what the law was we must try to ascertain what the colonists of those days believed it to be, and to learn what they believed it to be we must try to discover what they did.
“ The respondents, rejecting the allotments as insufficient to divest the title of the township, take their stand upon the position that in 1818 lots numbers 31 to 35 of the Quogue Purchase, Last Division, were still undivided commons, the title vested in the township or in the trustees that represent it. The reason why the year 1818 is important is because in that year the Legislature passed a statute whereby whatever title to the undivided lands had belonged theretofore to the Trustees for the Freeholders and Commonalty of the Town of Southampton was transferred to a new body corporate, £ the Trustees of the Proprietors of the undivided lands of the town of Southampton ’ (Laws of 1818, ch. 155). The provisions of this statute, since they are the source of respondents’ claim of title, must be stated with precision. By section 1, ‘ the proprietors of the undivided lands and meadows, held by them as tenants in common,’ were authorized to meet at a stated time, and annually thereafter, to elect for the term of one year ‘ not less than six nor more than twelve persons, being proprietors, trustees to manage all the undivided lands, meadows and mill streams in said town of Southampton. ’ By section 2, the trustees were declared to have ‘ the same power to superintend and manage the undivided lands, meadows and mill streams ’ as had formerly belonged to the trustees of the freeholders and commonalty of the town, and also to sell, lease and partition them. By section 3, the clerk of the trustees was charged with a duty £ to keep a record of the names of each proprietor, and the amount of right to him or her belonging, and to make transfers of the same;’ and no person was to be £ entitled to a vote at any meeting of said proprietors, without their names are entered on said record. ’
££ The respondents’ claim of title to the premises in suit is derived through mesne conveyances from a sale by the trustees *224 of lands described as undivided. On November 7,1882, the Trustees of the Undivided Lands of the Town of Southampton delivered to one Maxwell for a consideration of $500 a quitclaim deed of all the right, title and interest of the grantors in the undivided lands under water in Shinnecock bay within the limits of the Quogue Purchase; the lands under water in the Great South bay and connected creeks within the same limits; the lands under water in Canoe Place pond; and the beach and shore of Peconic bay within stated bounds. If the quitclaim had stopped there, it would have given no color of right to a claim of title to the land in suit. In closing, however, it supplements the detailed description by a more general one as follows: ‘ together with all other undivided lands which may exist within the limits of the said Quogue Purchase (so-called).’ This deed being intended to convey all the right, title and interest which the proprietors of the undivided lands have in said Quogue Purchase (so-called). The respondents’ claim of title to the upland is based upon this clause.” (Emphasis added.)
Again in People ex rel. Howell v. Jessup (160 N. Y. 249), the court said at page 259: “In construing a charter containing similar provisions, Chief Justice Taney said: ‘ It is not a deed conveying private property, to be interpreted by the rules applicable to cases of that description. It was an instrument upon which was to be founded the institutions of a great political community; and in that light it should be regarded and construed. ’ Were there no authorities in existence commanding such a decision, we could, guided by this rule alone, quite readily reach the conclusion that the letters patent were broad enough in terms to grant to the trustees of the freeholders and commonalty of the town of Southampton not only the lands under the waters, but the sovereignty over the waters ” (italics supplied); and at page 265: “ The result of our investigation is that we conclude that the crown had authority to grant not only the land and the lands under the water, but the waters as well at this point, and that the title and the sovereignty over such water and the lands thereunder was by the Andros and Dongan charters vested in and conferred upon the trustees for the freeholders and commonalty of the town of Southampton ” (italics supplied); at page 267: “ The conclusion drawn by us from these enactments and provisions of the organic law is that the title and all rights of control granted to the trustees for the *225 freeholders and commonalty of the town of Southampton was confirmed by the enactment of the colonial legislature, and continued by the provisions of the first and subsequent Constitutions
The littoral and the strand of the Southampton and Brook-haven proprietary lands have been used for centuries for recreation, including bathing, boating and fishing. The waters and docks have been utilized to anchor and berth boats. That such use was proprietary is beyond cavil. In 1818 — as stated in Beers v. Hotchkiss (supra, p. 58) —the Legislature created a body called the “ Trustees of the Proprietors of the common and undivided land of the town of Southampton ’ ’ and conferred upon them all rights of management of the 11 undivided lands, meadows and mill streams ’ ’ of the town and the power to ‘ ‘ sell, lease and partition ’ ’ the same; however, there was reserved to the trustees of the freeholders and commonalty of the town the right of management of the waters within the town and of “ the fisheries, seaweed and productions of the waters ’ ’, for the benefit of the town, and to its inhabitants was reserved ‘ ‘ the privilege of taking seaweed from the shores of any of the common lands of the town ” (L. 1818, ch. 155). The trustees of the proprietors conveyed a portion of undivided beach property to an individual who conveyed to one Frederick H. Betts. In both of these deeds of conveyance there was reserved the right to the public of passing and repassing along the ocean shore, of bathing in the ocean and of landing boats at the head of the pond, etc. On this property were constructed cottages for summer residents and a church. Shortly before the turn of the century, the trustees of the freeholders instituted a suit against Betts in ejectment. In order to establish their title to the beach property, they insisted before this court ‘ ‘ that the beach was a part of the common lands of the town, held by its trustees for a public use, and that it necessarily was so from its peculiar character and from the uses to which it was put.” They also argued “ that the act, in its transfer of title from the one set of trustees to the new set, then created, concerned only lands which always had been those of the proprietors and which remained undivided; that those undivided lands did not include lands inherently of the character of such as usually are held for public use and that there was evidence proving, or tending to prove, that the beach, or seashore, had always been reserved for the public use and, therefore, could not have been *226 comprehended within the lands affected by the act of 1818 In effect their position was that this beach property and the uses to which it was put were necessarily governmental in nature and title to it could not have been vested in a nongovernmental body with only proprietary powers, as was the trustees of the proprietors of the undivided lands. But the court rejected this argument and held that the 1818 act intended no such exception and that the shore lands or beaches were just as much common and undivided lands within the terms of the trust, as were any other lands within the town boundaries (Trustees of Southampton v. Betts, 163 N. Y. 454, 458, 459). (Cf. Caldwell v. Village of Island Park, 304 N. Y. 268, wherein this court declared that a beach owned by a municipality was owned in a proprietary capacity.) Consequently, the decision in Knapp v. Fasbender (278 App. Div. 970, appeal withdrawn 303 N. Y. 803) was in error to the extent that it held that the board of trustees was without the power to acquire lands for a beach or a recreation project.
We can perceive no differences in purposes in the modern recreational aspects of projects described in Proposition No. 1: the beach; the parks; and the recreational fields from the uses proprietary lands have been committed to in a county bordering on the ocean, the sound and many bays. Similarly the parking lots designed to harbor modern means of transportation are akin to the anchorage and berths heretofore provided by trustees for a major means of transportation in a time and in a county whose inhabitants, as the cases show, were engaged in using and enjoying the advantages of the ocean, sound, bays and harbors which embrace the Suffolk lands. Furthermore, to the extent that these parking lots facilitate the transportation of the inhabitants in and about the community, they are analogous to transit systems. The operation of such systems by municipalities had been repeatedly held by this court to be a proprietary and not a governmental function (see City of New York v. New York Tel. Co., 278 N. Y. 9, and cases cited therein). In Edinger v. City of Buffalo (213 N. Y. 674) it was held that the establishment of a playground is not a governmental function, and in Augustine v. Town of Brant (249 N. Y. 198) we found that the establishment of a town park was the exercise of a proprietary power (see Matter of City of New York [Gillen Place], 195 Misc. 685, affd. 278 App. Div. 779, affd. 304 N. Y. 215: garage and depot).
*227 It is evident that actions of boards of trustees in acquiring, holding, managing, leasing, controlling, conveying, granting and disposing of real property and personal property have been authorized frequently by the Legislature and approved by the courts. Such acts have been alluded to in the decisions heretofore cited. Further illustrations of such activities are found in Sanger v. Merritt (120 N. Y. 109, 112-113) where this court said: “ The litigants agree that in the seventeenth century the town of Huntington through the trustees for the freeholders and commonalty thereof, succeeded to the rights of the British Crown and of the Indians, and became the owner of the lands in dispute and of the adjoining lands. * * * the undivided lands were held, and managed by the trustees for the benefit of all. Frequently additional lands were acquired by the town in the name of the trustees, as was done by the town of Huntington ” (emphasis added), and in People ex rel. Swan v. Doxsee (136 App. Div. 400, 401, affd. on opinion below 198 N. Y. 605), where trustees under chapter 455 of the Laws of 1903, took title to a dock at Islip, Long Island: “ The act in question provided that the trustees of the town lands ‘ shall have the charge and supervision of all such docks, bulkheads and landing places, and the power to prescribe rules and regulations for the use thereof by the public.’ ” (Italics supplied.)
And in Town of Huntington v. Titus (50 App. Div. 468, 470, 471, affd. without opinion 169 N. Y. 579) where the agreement between one Townsend and the trustees contemplated a reversion of the real and personal property to the trustees for a failure to perform certain conditions subsequent, the court did not question the power of the trustees to enforce the agreement, even though the natural consequence would have been to place the trustees in the business of milling.
The legislative enactments relating to these trustees are consistent in recognizing the existence of the trustees and their powers to acquire, manage and dispose of the lands. Consistent also were all actions taken by the trustees and their predecessors in pursuance of these powers. They have made numerous conveyances of these lands to individuals pursuant to resolutions of the board of trustees and have also made leases of docks and of oyster beds under waters of the harbors and bays of Huntington. The Suffolk County records of conveyances from 1694 to the present time, as well as the cases cited, show that the conveyances *228 were the acts of the trustees of the freeholders and commonalty of the Town of Huntington or their successors, the board of trustees of the Town of Huntington and not of the town board.
Legislative acknowledgment of this legal title in the trustees of the Town of Huntington is found in former statutes.
By chapter 105 of the Laws of 1872, the Town of Babylon was carved out of the Town of Huntington. This act directed the trustees of the freeholders and commonalty of the Town of Huntington to execute all releases and conveyances necessary to effectuate the provisions of the act; it appointed the supervisor and justices of the peace of the Town of Babylon, ex officio, trustees of the Town of Babylon, with power to hold, manage, control, convey and dispose of the real estate of the Town of Babylon.
Thereafter and before delivery of the conveyance by the trustees of the freeholders and commonalty of the Town of Huntington to the board of trustees of the Town of Babylon of the land held by the former within the limits of the newly formed town, the Legislature enacted chapter 492 of the Laws of 1872 abolishing the office of the trustees of the freeholders and commonalty of the Town of Huntington and creating in its place, the board of trustees of the Town of Huntington, to consist of the supervisor, assessors and town clerk, and vested them with “ all the rights, privileges, powers, duties and jurisdiction heretofore enjoyed by such trustees, over the real and personal property of the town of Huntington.” (Italics supplied.)
Thereafter the board of trustees of the Town of Huntington, by deed dated January 3, 1873, conveyed to the trustees of the Town of Babylon “ all such right, title, interest, property, possession, claim and demand as they, the said Board of Trustees of the Town of Huntington, have or ought to have in or to all or any lands or real estate which is situated in the Town of Babylon ’ \
Thus, by progressive legislative acts of the Colonial Legislatures and subsequent Legislatures, this State has continued the legal existence of the trustees, has recognized their legal title to the lands and confirmed their power.
Comparison of the powers and duties of the board of trustees, as they have existed and have been exercised, with the provisions of chapter 816 of the Laws of 1952, clearly demonstrates that this act is but a declaratory and confirmatory one.
The avowed purpose of the enactment of the present legislation was to clarify the distinctions between the town board of the *229 Town of Huntington and the hoard of trustees of the Town of Huntington and to define and confirm the powers of the hoard of trustees of the Town of Huntington.
Chapter 816 of the Laws of 1952 confirms all acts heretofore taken by the board of trustees in the exercise of their powers under the Nicholls, Dongan and Fletcher patents. Among these powers is the power of holding legal title to the common lands in a proprietary capacity for the benefit of the inhabitants of the town (Robbins v. Ackerly, 91 N. Y. 98; Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1; People ex rel. Howell v. Jessup, 160 N. Y. 249, 262, supra; Sammis v. Town of Huntington, 186 App. Div. 463, 467). We have held that the title to lands under water remains in the board of trustees. Heretofore the trustees’ title to structures erected on submerged lands and their power to grant rights to take oysters from such lands have been judicially approved. The dredging contracts here, whether they be characterized as contracts for the sale and disposal of gravel and sand, or for the dredging of Huntington Harbor and Bay involve actions on the part of the board of trustees which were essentially proprietary in nature. The trustees holding the legal title to the land under water alone possessed the power to enter into such contracts. The trustees had the exclusive right to enter into a contract to dispose of sand and gravel in the soil or bed of the harbor and bay (Sammis v. Town of Huntington, 186 App. Div. 463, 467, supra; L. 1888, ch. 279). Any improvements to the harbor or bay were consequential benefits incidental to the removal of the sand and gravel. The dredging contracts did not restrict the dredging corporation to specified channels. On the contrary, the areas specified in the contract comprised virtually the entire area beneath Huntington Harbor and a large stretch under shallow water in Huntington Bay. The dredging corporation undertook no obligation to dredge these waters unless the operations proved to be commercially profitable. The dredging-company could abandon the dredging operation under these circumstances. This contract condition is inconsistent with the purpose of a contract entered into with navigation as its primary object. These contracts thus show on their face that their dominant purpose is not to deepen this yachting harbor but to sell or dispose of sand and gravel. Benefits flowing from the improvement of the harbor and bay, valuable though they may be, were subsidiary to the prime purpose of the contracts. In any event. *230 the contracts do not relate to navigation in the sense that they pertain purely to dominion, control or regulation of navigable waters by blocking free and unlimited passage over them. The cases cited by the dissent are not in point. In each of those cases, there was some form of dominion or control of navigable waters in that they involved the erection of permanent structures which would prevent unlimited and free access over the navigable waters, concerned contracts entered into by the United States Government, or had as their single objective the absolute commitment of funds of the community to a contract obviously designed solely to improve navigation according to specific plans and specifications.
The right to sell or dispose of the sand and gravel necessarily conferred the authority to dredge, otherwise the sand and gravel could not be sold.
The legislative ratification and confirmation of the right to exercise such a power does not result in a ratification of the contract. The contract must be in the public interest and not be the cause of waste or injury to public property. The board of trustees is not dispensed from accounting as to the adequacy of the consideration or the disposition of the proceeds. However, such questions must be decided in actions bearing on those issues.
To uphold the plaintiffs’ contention that no title to the lands was vested in the trustees, we must find that all the acts of the Legislature must be construed to have no force or effect. Such a construction is entirely without a precedent. The authority of the Legislature to define, clarify and confirm powers of trustees or to deprive them of their powers is discussed in People ex rel. Squires v. Hand (158 App. Div. 510, 515), the court there stating:
“ But this charter did not surrender control over the town officials or erect independent governmental agencies that should forever remain beyond the reach of the Legislature. Such a perpetual imperium in imperio would have been as repugnant to British colonial administration as its inequality and favoritism are opposed to our present political standards.
“ All these charters have been the subject of legislative modification. No court has questioned this power to make such changes, as such grants are not private but public and governmental. That in its radical modification of the powers of the Southampton trustees, the Legislature responded to a popular demand in 1818, does not detract from its exercise of the right *231 to interfere with these officials. It then took from the chartered town trustees the greater part of their powers, which it conferred on the newly formed board of proprietors.
“ Huntington’s Dongan patent had complete revision in 1872. The territory of Babylon was set off (Chap. 105) and later (Chap. 492) the charter trustees of Huntington were abolished and new town officers substituted. Similar important modifications were enacted in respect to the trustees of Brookhaven. (Laws of 1898, chap. 480 § 4, as amd. by Laws of 1899 chap. 73.) When this constitutional objection was urged as to New York city, it was held that the Dongan charter was governmental and not private, and, therefore, was subject to full power of amendment. (Demurest v. Mayor, 74 N. Y. 161.)
‘ ‘ The fact that these trustees at one time had title to the common lands, and have also title to the lands under water and are vested with riparian rights does not make them the less public. Such title is held in trust for all the inhabitants as a public and governmental agency. The Legislature can, therefore, change the number of such trustees, and can make their term of office biennial to conform to the elections of other town officials.”
With the legislative acts and precedents in mind, it cannot be supposed in the absence of a specific restriction that the Legislature intended that the trustees must have prior authorization from the electors. In searching for an authority for such a procedure, the statutes, defining the powers of trustees in contradistinction to other legislative acts* providing for prior authorization, reveal nothing requiring the enforcement of such a condition. The reports of adjudicated cases in our courts show that in the early days of the towns of Suffolk County and of the Town of Huntington, approval at town meetings of the actions of the trustees of the freeholders and commonalty of the town was customary. (Denton v. Jackson, 2 Johns. Ch. 320, 326.) On the other hand, the evidences are many that, with the growth of the population and increases in the number of transactions consummated by the trustees, prior authorization of the electors was seldom sought or obtained. Customs and practices were altered indicating that there was no legal compulsion to hold meetings. From 1689 to 1755 meetings were held yearly or twice yearly to authorize specific transactions, from 1787 to 1830 less frequently, *232 and from 1842 to 1909 occasionally. Inspections of the minutes of the records of the Clerk of Suffolk County involving about two hundred transactions of titles to real estate, disclose only a small number of authorizations by electors. To hold that trustees lacked the power to transact their business on their own resolution is to read into prior legislative acts and the 1952 statute a restriction plainly not a part of the statutes, a restriction contrary to actual practices as revealed by official records and a restriction casting doubt on the security of transfers of titles of great communities in Suffolk County.
No one can read the history of these various legislative acts and the cases dealing with trustees’ activities without realizing that boards of trustees have always possessed all of the powers enumerated in the Act of 1952.
The Legislature having confirmed the existence of this board of trustees on prior occasions surely has the power to enact a statute defining, clarifying and confirming its powers and ratifying the exercise of such powers.
Therefore we conclude that chapter 816 of the Laws of 1952, together with the prior legislative acts and decisional law, conclusively establish the powers of the board of trustees to enter into the contracts described in Proposition No. 1 without the approval of the electors at town elections. Such a construction of the statute does not extend the trustees ’ proprietary powers so as to include important governmental powers or to interfere with the coexisting town board. This does not mean, however, that the statute ratifies the contracts; it only confirms the power of the trustees to enter into the contracts. Such a definition and confirmation of the powers of the trustees does not and cannot be construed to be a ratification of any corrupt or improvident conduct indulged in by the trustees in connection with the exercise of these powers nor protect them against the consequences of a suit or proceeding in which a violation of their trust is proved.
We now turn to a consideration of the question of whether chapter 816 of the Laws of 1952 is liable to objection on the ground that it shows a substantial departure from the provisions of the Constitution.
It is fundamental “ that nothing but a clear violation of the Constitution will justify a court in overruling the legislative will. Every statute is presumed to be constitutional, and every *233 intendment is in favor of its validity.” (Matter of New York Elevated R. R. Co., 70 N. Y. 327, 342.) The presumption of constitutionality of chapter 816 of the Laws of 1952 has not been overcome.
We said in New York Central & H. R. R. R. Co. v. Williams (199 N. Y. 108, 127, affd. 233 U. S. 685): “ Again and again the courts of this country have asserted the proposition, in almost every form in which the English language can phrase it, that it is their duty to uphold a statute enacted by the legislature as constitutional if it is possible to do so without disregarding the plain command or necessary implication of the fundamental law. If the lawmakers have not violated the Constitution their work must stand until they themselves destroy it, no matter what the courts may think of the wisdom or probable effect. [1] The courts have no right to set aside, to arrest or nullify a law passed in relation to a subject within the legislative authority on the ground that it conflicts with their notions of natural right, absolute justice or sound morality. ’ (Slack v. Jacob, 8 W. Va. 612.) ” (Emphasis added.)
Chapter 816 of the Laws of 1952 does not violate the requirements of section 15 of article III of the Constitution as the act embraces only one subject and its entire subject matter is expressed in its title. The title states that the purpose of the act is to ratify and confirm the legal title of the trustees and to ratify and confirm the acts of the board of trustees and define the powers and duties of the board. Section 2 deals with the powers subsidiary to the relationship of the status of a title holder. Section 3 confirms the actions performed in the exercise of the powers. Section 4 spells out the definition by distinguishing the status of board of trustees from the town board and characterizes the nature of the trust and the additional and alternate remedy available to review the performance of the powers.
In Burke v. Kern (287 N. Y. 203, 213) we said: “ In applying the constitutional provision, the courts have formulated various tests, chief among which has been a limitation of the subject-matter to one subject, which, however, may embrace the carrying out of that subject-matter in various objective ways, provided the objectives are naturally connected with the subject-matter and the title could be said to apprise the reader of what may reasonably be expected to be found in the statute.”
*234 The statute before the court meets the test in every respect since every provision is directly referable to the subject matter described in the title. The title meets the constitutional requirements by expressing fairly and unequivocally the subject of the Act. (People ex rel. Olin v. Hennessy, 206 N. Y. 33; People ex rel. Corscadden v. Howe, 177 N. Y. 499, 504.)
The references in chapter 816 of the Laws of 1952 to the Town Law, to article 79 of the Civil Practice Act, and to section 1307 of the Civil Practice Act are not such an incorporation as is prohibited by section 16 of article III of the Constitution. In People ex rel. Everson v. Lorillard (135 N. Y. 285, 291) we stated: “ When a statute in itself and by its own language grants some power, confers some right, imposes some duty, or creates some burden or obligation, it is not in conflict with this constitutional provision because it refers to some other existing statute, general or local, for the purpose of pointing out the procedure, or some administrative detail, necessary for the execution of the power, the enforcement of the right, the proper performance of the duty or the discharge of the burden or obligation.”
The remedy provided for in chapter 816 (subd. 4), stating that the acts of the trustees are subject to review by the Supreme Court under the provisions of article 79 of the Civil Practice Act, is in addition to and alternative to the remedies available to taxpayers and aggrieved parties under section 51 of the General Municipal Law and article 78 of the Civil Practice Act, respectively. The trustees here have not only the status of trustees but also the status of public officials. Their responsibility and accountability continues in respect to all actions involving public interests.
Since we have concluded that the exercise of the powers of the board of trustees in relation to the making of the contracts set forth in Proposition No. 1 did not require a resolution of the town board, and the prior authorization or subsequent approval by qualified electors at a town election, no real controversy exists as to the resolution of the town board or Proposition No. 1.
In the light of this decision no purpose would be served by a discussion of the proposition which is a nullity. Therefore, the judgment of Special Term to the extent that it dismissed the complaint was proper, and the judgment of the Appellate Division should be affirmed.

 Local Finance Law, § 35.00; Town Law, § 81; Local Finance Law, § 38.00; Town Law, § 179.

. The text of the proposition passed at the special town meeting on May 15, 1951, is as follows:
“ proposition number one [there were no other propositions]
Shall the action of the Supervisor, Justices of the Peace and Town Clerk of the Town of Huntington in acquiring for the town in the name of the Board of Trustees the 22 acre beach and park at Centerport, the various lots comprising the recreation fields in Greenlawn, East Northport and Huntington Station, the several parking lots in Huntington Village, Huntington Station and East Northport and the Gerard Street Extension; and in improving and maintaining the same; and in contracting with the TJ. S. Dredging Corp. for the dredging of Huntington’s harbors and bays and using the revenues therefrom for the foregoing purposes, be approved?”