THE PEOPLE OF THE STATE OF NEW YORK ex rel. MARCELINO JULIO, Also Known as JULIO MARCELINO, Appellant, v WILSON WALTERS, as Superintendent of the Ossining Correctional Facility, et al., Respondents.

Second Department, July 26, 1982

APPEARANCES OF COUNSEL

*William E. Hellerstein* and *Donald H. Zuckerman* (*Roger Brazill* of counsel), for appellant.

*Robert Abrams, Attorney-General* (*Burton Herman* and *Gerald J. Ryan* of counsel), for respondents.

OPINION OF THE COURT

*Per Curiam.*

In April, 1964 the petitioner, Marcelino Julio, was convicted in the Supreme Court, New York County, of the crime of manslaughter in the first degree and was sentenced to imprisonment for an indeterminate term of 15 to 25 years.

On January 10, 1973 petitioner was paroled with a maximum expiration date of March 15, 1989.

On December 10, 1975, while in Puerto Rico with permission of his parole officer, petitioner was arrested on an indictment returned by a Federal Grand Jury in the Southern District of New York, charging violation of Federal drug laws.

In early January, 1976 petitioner was extradited to New York and incarcerated at the Metropolitan Correctional Center in Manhattan. On January 20, 1976 petitioner's parole officer visited him in Federal custody and questioned him about his arrest but did not serve him with parole violation charges.

On March 20, 1976 petitioner was found guilty of conspiracy to violate Federal narcotics laws. On April 1, 1976 the Board of Parole declared petitioner delinquent as of December 10, 1975 and issued a parole violation warrant against him. On April 27, 1976 petitioner was sentenced to a term of seven and one-half years' imprisonment on the Federal conviction.

On May 5, 1976 petitioner was transferred from the Metropolitan Correctional Center in New York City to the Federal Correctional Facility in Atlanta, Georgia.

On May 6, 1976 New York officials attempted to lodge the parole violation warrant at the Metropolitan Correctional Center. In light of the fact that petitioner had been transferred to Atlanta on the previous day, the warrant was forwarded to that facility where it was eventually lodged against petitioner.

On July 8, 1976 petitioner was notified by Federal authorities that the New York detainer warrant had been filed with the Sheriff of Fulton County, Georgia.

On or about July 27, 1976 petitioner formally requested the New York State Parole Board to conduct a prompt parole revocation hearing.

On August 5, 1976 L. V. Kavanaugh, director of parole field operations, wrote to petitioner stating in relevant part: "Please be advised that the New York State Statutes do not mandate that any parole violator be given a final

revocation hearing while he is serving a sentence in a foreign jurisdiction."

Petitioner again wrote to request a parole revocation hearing and on August 23, 1976 Mr. Kavanaugh replied stating in part: "In regard to a hearing, please be advised that you will be given a hearing when you are returned to the State of New York."

On October 22, 1980 petitioner was released from Federal custody and was arrested on the detainer warrant by the Sheriff of Fulton County, Georgia.

On October 28, 1980 he was returned to New York.

On December 8, 1980 he was afforded a final parole revocation hearing. On the very same date, a writ of habeas corpus was issued on Julio's petition which alleged that the United States Bureau of Prisons had a policy (which was evinced by an exhibit annexed to the petition) of making Federal prisoners available to State authorities upon their request for the disposition of pending charges including parole revocation charges. The petition further alleged that had such a request been made by the New York State Board of Parole to the United States Bureau of Prisons, the petitioner could have received a prompt final parole revocation hearing in New York City.

In opposing the writ, the Attorney-General argued that a final parole revocation hearing had in fact been afforded petitioner on December 8, 1980 and that pursuant to numerous precedents, a parole violator incarcerated in a foreign jurisdiction was only entitled to a parole revocation hearing upon his return to the jurisdiction of the New York State Board of Parole.

On December 23, 1980 Special Term denied the application and dismissed the writ, holding that while petitioner was in Federal custody in Georgia he could not be "subject to the convenience and practical control of the Parole Board, and the final revocation hearing was not required to be given petitioner until his return to New York State". (See Correction Law, former § 212, subd 7; Executive Law, § 259-i; *People ex rel. Walsh v Vincent,* 40 NY2d 1049; *Matter of Beattie v New York State Bd. of Parole,* 39 NY2d 445; *Matter of Mullins v State Bd. of Parole,* 43 AD2d 382,

app dsmd 35 NY2d 992; *People ex rel. Spinks v Dillon,* 68 AD2d 368, app dsmd 48 NY2d 1025.)

A motion to reargue was thereafter brought on by petitioner, relying on *People ex rel. Gonzales v Dalsheim* (52 NY2d 9) which held that even where a parolee was incarcerated in another jurisdiction it was incumbent on the Parole Board to show that a hearing could not be held subject to its convenience and practical control.

In effect granting the motion to reargue, and adhering to its original determination, Special Term specifically held, *inter alia,* that *People ex rel. Gonzales v Dalsheim (supra)* should not be applied retroactively. Specifically, the court stated: "The determination made by the respondent board in October 1980 were [*sic*] in keeping with the many appellate court decisions which * * * concluded that a parolee being held in an out-of-state prison is not within the convenience and practical control of the New York State Parole Board * * * This issue apparently has now been decided differently * * * by a vote of 4-3 by the Court of Appeals for the first time. When the respondent made its determination in the case at bar, it was made in accordance with the then law of the State of New York, and * * * should not be applied retroactively".

We agree with the holding of Special Term with respect to the issue of retroactivity.

Preliminarily, it must be stressed that petitioner's request in July, 1976 for a final parole revocation hearing and the Parole Board's answer to petitioner in August, 1976 that he would be given a hearing when he returned to New York not only predated the Court of Appeals decision in *Gonzales,* but also predated a similar holding of this court in the case of *Matter of Higgins v New York State Div. of Parole* (72 AD2d 583), which was decided on October 22, 1979. It must be stressed that prior to *Higgins,* established case law was to the effect that the Parole Board did not have to afford a final parole revocation hearing to a person who was held in a prison in a foreign jurisdiction pursuant to a conviction for crimes committed therein. (See *Matter of Mullins v State Bd. of Parole,* 43 AD2d 382, *supra; People ex rel. Spinks v Dillon,* 68 AD2d 368, *supra.*)

The crucial issue in this case therefore is whether the decisions in *Higgins* and *Gonzales* should be construed to apply retroactively to events which transpired in 1976, long before they were decided. We are of the view that the question posed must be answered in the negative.

It is the general rule that a decision which overrules a prior decision is to be given retroactive application to all those cases in the judicial process then pending and undecided, including those on appeal (see Prospective or Retroactive Operation of Overruling Decision, Ann., 10 ALR3d 1371, § 4). Pursuant to this rule appellate courts generally give effect to the law as it exists at the time their decisions are rendered (*People v Loria,* 10 NY2d 368; *Knapp v Fasbender,* 1 NY2d 212, 243; *Matter of Tartaglia v McLaughlin,* 297 NY 419, 424).

Although there has been a traditional policy of retroactive application, it is now well established that courts have the power to apply an overruling decision purely prospectively and to declare that the rule announced by the overruling decision will operate only upon future transactions or events (Ann., 10 ALR3d 1371, § 7, subd [a]). In the case of *People v Morales* (37 NY2d 262, 267-269) the Court of Appeals discussed the principles involved in determining whether to apply a case retroactively or prospectively, as follows:

"The concept of 'retroactivity' is not new. It has an ancient tradition, under which Judges were not deemed to 'make law' as such, but to 'pronounce the law' which, even if it had previously been enunciated erroneously, was conceived of as having always been there, waiting just to be correctly stated. (Mishkin, The High Court, the Great Writ, and the Due Process of Time and Law, 79 Harv L Rev 56, 58.) Consequently, since the 'correct' law was looked upon as having always been the same, a case decided on direct appeal always received the benefit, or detriment, of any decisional law 'pronounced' before its judgment became final. (See *United States v Schooner Peggy,* 1 Cranch [5 US] 103, 110.) However, once a judgment had become final, it was not affected by law freshly 'pronounced' thereafter. (1 Blackstone's Commentaries 69 [15th ed]; 1 Black, Judgments [2d ed], §§ 245, 246.)

"Building on that historic common-law doctrine, during the 1960's the United States Supreme Court, especially in cases involving deprivations of constitutional due process rights under the Fourteenth Amendment in criminal cases, began to employ retroactivity in expanded and varied forms ·* * *

"Analysis of the Federal and State cases does not, however, yield a set of definitive principles. 'Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of· justice, and the way in which these factors combine must inevitably vary with the dictate involved'. (*Johnson v New Jersey,* 384 US 719, 728; see, also, *Desist v United States,* 394 US 244, 251.)

"Nevertheless, some clues are discernible, a useful one being the very general guides set out in *Desist v United States* (*supra,* p 249) as follows: 'The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.'" (See, also, *People v Gordon,* 77 AD2d 659, 661.)

Applying these criteria to the rule announced in *Matter of Higgins v New York State Div. of Parole* (72 AD2d 583, *supra*) and *People ex rel. Gonzales v Dalsheim* (52 NY2d 9, *supra*) it is our view that prospective and not retrospective application is warranted.

The first criterion is "the purpose to be served by the new standards". In *Morrissey v Brewer* (408 US 471), the Supreme Court declared that due process required a reasonably prompt, two-stage, inquiry (1) to determine whether there was probable cause to believe that a parolee had violated a condition of his parole and, if so, (2) to determine with somewhat greater formality whether such a violation had actually occurred. The rationale behind this ruling was that the State could not again deprive the parolee of his liberty without "some orderly process, however informal" (408 US 471, 482, *supra*).

The reasoning behind requiring prompt revocation hearings is apparently to get the matter over with quickly

while the evidence of guilt or innocence of the violation is fresh. Where, as here, the parolee has been convicted of another crime, and is not merely awaiting trial therefor, the foreign conviction constitutes *prima facie proof* of the parole violation.

Secondly, the granting of a prompt parole revocation hearing to a New York parolee who is subsequently incarcerated in another jurisdiction by reason of the commission of and conviction for, another crime committed therein does not enable the parolee to have his existing New York sentence run concurrently with the sentence on the new conviction. Section 70.40 of the Penal Law states in this regard as follows:

"3. Delinquency.

"(a) When a person has violated the terms of his parole and the state board of parole has declared such person to be delinquent, the declaration of delinquency shall interrupt the person's sentence as of the date of the delinquency and such interruption shall continue until the return of the person to an institution under the jurisdiction of the state department of correction * * *

"(c) Any time spent by a person in custody from the time of delinquency to the time service of the sentence resumes shall be credited against the term or maximum term of the interrupted sentence, provided:

"(i) that such custody was due to an arrest or surrender based upon the delinquency; or

"(ii) that such custody arose from an arrest on another charge which culminated in a dismissal or an acquittal; or

"(iii) that such custody arose from an arrest on another charge which culminated in a conviction, but in such case, if a sentence of imprisonment was imposed, the credit allowed shall be limited to the portion of the time spent in custody that exceeds the period, term or maximum term of imprisonment imposed for such conviction."

What this section means in our case is that petitioner is not entitled, as he once claimed, to any credit for the time he spent in Federal custody on the narcotics conviction and no matter how quickly his revocation hearing was held, his New York sentence would not resume until he was re-

turned "to an institution under the jurisdiction of the state department of correction".

In short there was no pressing need for a prompt revocation hearing in this case because (1) the Federal conviction is prima facie proof of the parole violation and (2) no matter how early the hearing was held, the sentences could not run concurrently.

The other two criteria for determining whether an overruling decision should or should not be applied retroactively are the extent to which authorities relied upon the overruled decision and the possible effects upon the administration of justice of retroactive application. It is clear that the determination of the Parole Board in its letter to petitioner of August 23, 1976, that he would be given a hearing when he was returned to New York, was in full accord with then existing case law (*Matter of Mullins v State Bd. of Parole,* 43 AD2d 382, *supra; People ex rel. Spinks v Dillon,* 68 AD2d 368, *supra*). To apply *Matter of Higgins v New York State Div. of Parole* (72 AD2d 583, *supra*) and *People ex rel. Gonzales v Dalsheim* (52 NY2d 9, *supra*) retroactively and sustain the writ would prevent a declaration of parole delinquency and thereby give petitioner credit against his maximum sentence for all the time since his parole release in 1973. No deduction of credit for the time spent on the Federal charges would be allowed and petitioner would thus receive a windfall of some five years' credit against his New York sentence to which he would not otherwise be entitled.

The effect on the administration of justice of a retroactive application of *Higgins* and *Gonzales* can also be imagined, since any prisoner similarly situated to petitioner herein could petition for a writ of habeas corpus and obtain his release.

Accordingly, we conclude that *Higgins* and *Gonzales* should not be given retroactive application.

GIBBONS, J. (concurring in part and dissenting in part). Petitioner was convicted of the crime of manslaughter in the first degree in April, 1964, in the Supreme Court, New York County, and sentenced to an indeterminate term of imprisonment of 15 to 25 years. On January 10, 1973

petitioner was paroled with a maximum expiration date of March 15, 1989.

While in Puerto Rico with the permission of his parole officer, petitioner was arrested on December 10, 1975, on an indictment returned by a Federal Grand Jury in the Southern District of New York, charging him with violation of the Federal drug laws. In the early part of January, 1976, he was returned to New York City and detained at the Metropolitan Correctional Center in Manhattan awaiting trial.

On January 20, 1976 petitioner was visited by his New York parole officer at the Metropolitan Correctional Center and questioned concerning his pending Federal prosecution but was not then served with any notice of parole violation charges.

Thereafter, on March 20, 1976 petitioner was found guilty in the United States District Court for the Southern District of New York of conspiring to violate the Federal drug laws.

On April 1, 1976 a parole violation warrant was issued against petitioner by the Board of Parole in which he was declared to be delinquent as of December 10, 1975.

On April 27, 1976 he was sentenced to a term of seven and one-half years of imprisonment on the Federal charges.

Petitioner was transferred from the Metropolitan Correctional Center in New York City to the United States penitentiary in Atlanta, Georgia, on May 5, 1976.

On May 6, 1976, the day after petitioner's removal and 35 days after the warrant had been issued, it was lodged at the Metropolitan Correctional Center in New York.

On July 8, 1976 the Federal prison authorities notified the petitioner, for the first time, that a New York State parole warrant was lodged against him.

On or about July 27, 1976 petitioner sent a written request to the respondent Board of Parole which he denominated a "Petition for a Parole Revocation Hearing". He stated that he had recently learned of the warrant's existence and that its presence in his file prohibited his participation in various inmate programs. He requested that he

be given a parole revocation hearing within a reasonable time after a receipt of his request.

Shortly thereafter, in early August, 1976, petitioner received a reply from the respondent board informing him that it was not their intention to prevent his participation in any programs, but that he would not be given a parole revocation hearing until he completed his Federal sentence. Petitioner wrote back on August 10, 1976 and again requested a prompt revocation hearing and he again received a reply, on August 23, 1976, informing him that he would not receive a hearing until he was returned to New York.

On October 22, 1980, after having served over four and one-half years, petitioner was released from Federal prison to the New York State authorities pursuant to the parole warrant. He was held in the Fulton County, Georgia, jail until October 28, 1980, when the respondent board took custody of him.

On October 28, 1980 petitioner was returned to New York City and was formally notified of the parole violation charge against him. He waived his right to a preliminary hearing. He was thereafter transferred to Ossining Correctional Facility where a final parole revocation hearing was held on December 8, 1980, almost five years to the day after he was taken into custody and over four and one-quarter years after he demanded such a hearing.

It is alleged in the petition herein that "[i]t is the policy of the United States Bureau of Prisons to make Federal prisoners available to state authorities upon their request, for the disposition of pending charges, including parole revocation charges." The United States Bureau of Prisons "Policy Statement", dated January 7, 1970, was annexed to the petition as an exhibit.

Reference to said Bureau of Prisons policy statement reveals in the following language the underlying Federal endeavor toward establishing co-operation with the prison authorities of the several States: "GUIDELINES. Because cooperation between the various jurisdictions is essential to the efficient functioning of the criminal justice system in the United States, institutions have the responsibility to

accommodate state, local and military jurisdictions whenever possible."

Petitioner also alleges in his petition that "had the respondent Board of Parole made a request of the United States Bureau of Prisons, relator could have been transferred to the Metropolitan Correctional Center in New York City for the purpose of conducting a final parole revocation hearing".

In its answer, the Parole Board claims that while the petitioner was incarcerated in the Federal penitentiary in Atlanta, Georgia, he was not subject to its convenience and practical control, and that at the time he was declared a delinquent on April 1, 1976 as of December 10, 1975, the prevailing law construing section 212 of the Correction Law, which was then in force, provided that a final revocation hearing need not be afforded until the petitioner was returned to New York State from his Federal confinement. In support of this proposition of law, the Parole Board cites *Matter of Mullins v State Bd. of Parole* (43 AD2d 382, app dsmd 35 NY2d 992); *Moody v Daggett* (429 US 78); *People ex rel. Spinks v Dillon* (68 AD2d 368, app dsmd 48 NY2d 1025); *People ex rel. Dutcher v New York State Bd. of Parole* (71 AD2d 963); and *People ex rel. Delrow v New York State Div. of Parole* (75 AD2d 324, revd 52 NY2d 1057, after remand 81 AD2d 391, mot for lv to app dsmd 54 NY2d 784).

At the time of petitioner's arrest, conviction, and imprisonment under the Federal indictment, subdivision 7 of section 212 of the Correction Law, provided, in pertinent part, as follows: "Whenever there is reasonable cause to believe that a person who is on parole or conditional release has violated the conditions thereof, the board of parole *as soon as practicable* shall declare such person to be delinquent. Thereafter, the board shall *at the first available opportunity* permit the alleged violator to appear personally * * * and explain the alleged violation. Such appearance shall be either at an institution under the jurisdiction of the state department of correction or at such other place as may be designated pursuant to rules and regulations of the board. The board shall within a reasonable time make a determination on any such declaration of delinquency either by dismissing the declaration or revoking the parole or conditional release." (Emphasis added.)

Inasmuch as the determination of this appeal requires an examination of the *evolution* of the process of the law defining and expanding the rights of a parolee to a final revocation hearing within a reasonable time in furtherance of the constitutional due process demands of *Morrissey v Brewer* (408 US 471), consideration must now be turned to the following authorities.

At the outset, it may be noted that in February of 1975 this court, in *Matter of Beattie v New York State Bd. of Parole* (47 AD2d 656), which involved a local prisoner denied a prompt revocation hearing because he was temporarily housed in a State penal institution, held, in directing an "immediate hearing", "the parole board should be aware of the fact that continued indifference to the rights of defendants to obtain prompt revocation hearings may, in the future, result in the vacatur, with prejudice, of warrants in all such cases."

In *People ex rel. Allah v Warden, Bronx House of Detention* (47 AD2d 485, 487, app dsmd 38 NY2d 823), the First Department, in reversing the dismissal of a writ and vacating the detainer warrant where the defendant, a State prisoner, was denied a prompt revocation hearing because his detention in a city jail "terminated, in a sense, the constructive custody of the State Parole Board", held, *inter alia,* as follows (pp 487-488): "This argument may not serve as justification for the failure to hold a final parole revocation hearing. It has been aptly noted that the right to a prompt revocation hearing is analogous to the right to a speedy trial and that regardless of other pending criminal charges, due process mandates that the alleged parole violator be accorded the right to a hearing within a *reasonably prompt* period of time (*Morrissey v Brewer,* 408 US 471, 478-479; *Matter of Wright v Regan,* 46 AD2d 163; *Matter of McLucas v Oswald,* 40 AD2d 311; *People ex rel. McNair v West,* 77 Misc 2d 150, affd 46 AD2d 741). It is requisite that the Board of Parole in its adoption of rules relating to violation of parole proceedings recognize and implement the aspects of due process inherent in subdivision 7 of section 212 of the Correction Law."

Thereafter, in December, 1975 this court in *People ex rel. Walsh v Vincent* (50 AD2d 914), in reversing a judgment dismissing a petition, granting the same, and restoring the

petitioner to parole in a case where petitioner, as a local prisoner, was denied a prompt revocation hearing while lodged in a local facility, again concluded with the same admonition it made in the *Beattie* case.

Continuing in the chronological order of events, *Matter of Beattie v New York State Bd. of Parole (supra)* was affirmed by the Court of Appeals on April 27, 1976 in 39 NY2d 445, where the court, in dealing with the question concerning a situation where the petitioner, a local prisoner, was temporarily lodged in a State prison facility, held, *inter alia,* as follows (p 447): "Of course, the parolee, in order to receive a hearing, must be in the custody of a correction facility as an inmate in connection with which the Parole Board has parole jurisdiction (cf. *People ex rel. Petite v Follette,* 24 NY2d 60, 64). In this case, there was such custody and it is immaterial that the technical form of the custody was by virtue of temporary detention due to inadequate detention facilities in the City of New York (*People ex rel. Allah v Warden,* 47 AD2d 485, 487-488, *supra*). *The fact is that the parolee was in a place subject to the convenience and practical control of the Parole Board.*" (Emphasis added.)

Note should be taken that the warrant herein had already been issued on April 1, 1976, and petitioner was still detained in the Manhattan Federal detention facility, geographically located within the confines of this State, when *Beattie* was decided in the Court of Appeals.

In December of 1976, in affirming *People ex rel. Walsh v Vincent,* in 40 NY2d 1049, the Court of Appeals declared (p 1050) that jurisdictional control over the parolee is not, alone, the *sine qua non* to determine the existence of a "place subject to the convenience and practical control of the Parole Board". It held as follows (p 1050): "In the absence of a showing by the correctional or parole authorities that a particular local facility in the State is, for strong practical reasons, beyond its convenience and control, a situation difficult to bring to mind, a parolee is entitled to a prompt final parole revocation hearing."

The net effect of *Walsh* was that the majority of the court had rejected the rule expressed in *Moody v Daggett* (429 US 78, *supra*), which held that a prisoner was entitled to his

final revocation hearing only upon his return to the State correctional facility. This repudiation of the *Moody v Daggett* rule, upon which the Parole Board had relied in refusing to comply with petitioner's requests for a hearing in 1976, was later confirmed in *People ex rel. Gonzales v Dalsheim* (52 NY2d 9, 14), as follows: "We declined to follow the rule announced in *Moody v Daggett* (429 US 78) that a Federal parolee convicted of a Federal offense committed while on parole is not entitled to a prompt parole revocation hearing until he has been taken into custody as a parole violator at the expiration of the intervening sentence."

We next find that this court, on its own motion, on January 31, 1977, in *People ex rel. Royster v Bombard* (55 AD2d 940), *People ex rel. Orse v New York State Bd. of Parole* (55 AD2d 940), and *Matter of Edge v Regan* (55 AD2d 940) recalled and vacated its prior decisions and orders rendered in said cases in December, 1976 (55 AD2d 631), and *retroactively* applied the rule declared in *Walsh* to the effect that *Moody v Daggett* (*supra*) no longer provided a viable authority in this State.

In *People ex rel. Royster v Bombard* (*supra*, p 941) this court stated, as follows: "The petitioner was entitled to a prompt final parole revocation hearing, even though the violation of parole may have involved the commission of another crime (see *People ex rel. Walsh v Vincent*, 40 NY2d 1049; *Matter of Beattie v New York State Bd. of Parole*, 39 NY2d 445; *People ex rel. Allah v Warden, Bronx House of Detention*, 47 AD2d 485; *Matter of Wright v Regan*, 46 AD2d 163). A delay of 32 months (to the time of the institution of this proceeding) constitutes an infringement upon the petitioner's right to a prompt final revocation hearing. Hence, as it appears that the petitioner has served the term of his sentence under the 1973 conviction, he must be restored to his parole status under the 1966 convictions. The court notes that *People ex rel. Walsh v Vincent* (*supra*), which requires a prompt final parole revocation hearing even though the violation of parole may have involved the commission of another crime, rather than *Moody v Daggett* (429 US 78 [45 USLW 4017]), is controlling in New York State."

In the course of the ever-expanding body of law pertaining to the right of an individual paroled from a New York penal institution to a parole revocation hearing, while thereafter imprisoned in a Federal or foreign State correctional facility, vis-à-vis, whether, under such circumstances, said parolee was " 'subject to the convenience and practical control of the Parole Board' " (*People ex rel. Walsh v Vincent, supra,* p 1050) attention must now be directed to the holding of this court on October 22, 1979 in *Matter of Higgins v New York State Div. of Parole* (72 AD2d 583).

In *Higgins,* as here, the parolee was incarcerated in a Federal facility in another State and he claimed that, although the warden of the Federal facility indicated that upon request of the Parole Board the parolee would be transferred to the Federal Metropolitan Correctional Center in New York, the latter refused to take any steps toward such transfer for the purpose of scheduling a hearing. In *Higgins* the rule was further refined to provide that (p 583): "[a] prompt final parole revocation hearing is required whenever a parolee *is, or may be,* brought within the convenient and practical control of the parole authorities". (Emphasis added.)

The Court of Appeals again addressed itself to the question on December 22, 1980, in *People ex rel. Gonzales v Dalsheim* (52 NY2d 9, *supra*), which involved the refusal of the Parole Board to afford a timely final revocation hearing until the parolee's return to this State after serving a term of imprisonment in a New Jersey penal facility.

In considering the question, the court reviewed the line of opinions by tracing the developing interpretation of the statutes providing for parole violation hearings from those handed down in relation to section 212 of the Correction Law, which was in force here at the time of petitioner's Federal conviction, to the present provisions contained in section 259-i (subd 3, par [f], cl [i]) of the Executive Law which became effective on January 1, 1978.

In pronouncing the rule of the case, the court in *Gonzales,* at the very outset, referred to its 1976 holdings in *Matter of Beattie v New York State Bd. of Parole* (39 NY2d

445, *supra)* and *People ex rel. Walsh v Vincent* (40 NY2d 1049, *supra),* and stated (pp 14-15): "We turn, then, to apply to this case the principles declared in *Walsh,* namely, that a parolee is entitled to prompt revocation hearings if he is 'subject to the convenience and practical control of the Parole Board', and that the burden of showing that the parolee is 'beyond its convenience and control' lies with the Parole Board. In view of the relative ease of interstate communication and transportation and the vitality of legal and practical interstate co-operation today we perceive no sufficient justification for laying down a per se rule that imprisonment in a sister State means necessarily and always that the imprisoned parolee is not subject to the convenience and control of New York State parole authorities. The out-of-State aspect of such a situation, of course, will bear directly and significantly on the necessary showing to be made by the parole authorities; the determination, however, must necessarily depend on the circumstances of the individual case. Evidence of the reluctance or unwillingness of the correctional authorities in the sister State to co-operate in making appropriate provision for a suitable hearing or a demonstration that the hearing should be held within the State of New York and that, notwithstanding the co-operation of the authorities of the sister State, significant practical difficulty would be encountered in arranging for the presence of the parolee at such a hearing would suffice to meet *the modest burden placed on the New York State parole authorities."* (Emphasis added.)

It would thus appear that the Court of Appeals in *Gonzales* was not announcing a new principle of law, but rather applying existing legal principles which had been formulated as early as 1976 in the *Beattie* and *Walsh* cases, as well as referring to *Higgins (supra)* which was decided in 1979. By the time *Gonzales* was handed down, the law was clearly established that a parolee lodged in a penal institution outside the jurisdiction and geographical bounds of the Parole Board was entitled to a reasonably prompt revocation hearing unless the board could overcome the burden of showing that "significant practical difficulty would be encountered in arranging for the presence of the parolee at

such a hearing" (*People ex rel. Gonzales v Dalsheim, supra,* p 15).

In November of 1980, the Fourth Department, in reliance on the then prevailing rule as expressed in the Third Department decision in *People ex rel. Gonzales v Dalsheim* (76 AD2d 952 [June, 1980]), affirmed judgments denying writs of habeas corpus in *People ex rel. Pyclik v Smith* and *People ex rel. Copeland v Smith* (78 AD2d 1008) stating: "Relator was serving a sentence in a foreign State for a crime committed there, and there was no way before the end of that commitment that he could have been returned to New York for a final revocation hearing."

When, however, *People ex rel. Gonzales v Dalsheim* was reversed by the Court of Appeals in December of 1980 (52 NY2d 9, *supra*), the Fourth Department, in May of 1981, applying *Gonzales* retroactively, reversed the judgments in the *Pyclik* and *Copeland* cases, and restored the relators to parole supervision (81 AD2d 1042).

After applying the foregoing legal principles to which I have alluded and an examination of the salient facts existing in the instant matter, I am of the view that the petition should be granted, the writ sustained, and the petitioner restored to parole status.

In dealing first with the crucial question as to whether the petitioner was available to the Parole Board for a hearing on the charge of parole violation, consideration must first be given to that period between the time, in January, 1976, when he was held in the Metropolitan Correctional Center in Manhattan until his removal to the United States penitentiary in Atlanta, Georgia, on May 5, 1976.

On this record it is established that not only was his parole officer instrumental in providing information to the Federal authorities to facilitate his arrest in Puerto Rico, on December 10, 1975, but that he also visited petitioner in the Metropolitan Correctional Center on January 20, 1976, and, notwithstanding that the Parole Board was fully cognizant of his ultimate conviction on April 27, 1976 and that an indeterminate sentence of seven and one-half years of imprisonment in a Federal facility had been imposed,

the parole violation warrant, which had been issued on April 1, 1976, was not attempted to be executed for a period of about five weeks until May 6, 1976, which was the day *after* petitioner was removed from the Federal facility in Manhattan to one in Atlanta, Georgia.

Clearly, the petitioner was available at a location which was most convenient to the Parole Board although it was not one which was "under the jurisdiction of the state department of correction". It should be noted that, at that point in time, the Parole Board had already been admonished by this court as far back as December, 1975, in *People ex rel. Walsh v Vincent* (50 AD2d 914, *supra*) to be aware of the fact that the right to prompt revocation hearings was not to be suspended because the parolee, by happenstance, was lodged in an institution not under the jurisdiction of the Parole Board, but in a local correctional facility. No valid reason for this failure to afford petitioner a revocation hearing with reasonable promptness while he was held in Federal custody in New York City is revealed in this record. What is established, however, is that not only was there extant at this time the United States Bureau of Prison policy statement, dated January 7, 1970, which sets forth a comprehensive procedure to facilitate the transfer of the parolee to local State authorities to conduct parole violation proceedings, but also that the Parole Board was aware of this policy as demonstrated by the existence of a written "MEMORANDUM" of the Department of Correctional Services, dated February 25, 1976, from the deputy commissioner to "All Area Offices" and containing the words "SUBJECT: Parole Violators Serving Federal Sentences — Arrangements for Final Violation Hearings". This document contains detailed instructions concerning the procedure to follow with respect to letters received from Federal prison authorities to void parole violation warrants in the event such parolees are not provided with a final revocation hearing within 90 days of the date of such letter, and, in providing for such hearings to be conducted, it stated, *inter alia,* "The Board of Parole will be available for hearings at the Metropolitan Correctional Center on any Wednesday, following completion of hearings at Rikers Island."

This memorandum is attached to the petitioner's brief on appeal. It was never sought to be struck out, and its contents are not disputed. At the very least, it reveals that the Metropolitan Correctional Center is a local facility subject to the Parole Board's practical convenience, and, when considered in the light of the existing corresponding Federal policy to facilitate such hearings, the conclusion becomes inescapable that, in the language of Judge JASEN in his dissent in *People ex rel. Gonzales v Dalsheim* (52 NY2d 9, 22, *supra*) to permit delay in executing the instant warrant for which no convincing reason is advanced, would be to allow the Parole Board "to play a shell game with the various detainers to avoid giving a parolee a hearing".

By failing to afford the petitioner a hearing during this five-week period, and, by thereafter refusing his two written requests for a hearing made in July and August, 1976, he was delayed over four and one-half years before he was finally given such hearing. Had the Parole Board, at any time between April 1, 1976 and October 28, 1980, when petitioner was returned to New York, attempted to utilize the Federal procedure to afford him a parole revocation hearing, he could have been made available without "significant practical difficulty" (*People ex rel. Gonzales v Dalsheim, supra,* p 15) for such purpose at any convenient time during that period. His *continued* unavailability beyond the convenience and control of the Parole Board, was due solely to its own failure to act.

In *Matter of Garland v New York State Div. of Parole* (86 AD2d 848), decided by the First Department on February 25, 1982, in reversing two orders and vacating a parole revocation warrant which was lodged on December 10, 1979, while the petitioner was in Federal custody in the Metropolitan Correctional Center in New York City, the court applied *People ex rel. Gonzales v Dalsheim (supra)*, decided December 22, 1980, retroactively, where the petitioner's request for a disposition of the warrant, made on May 16, 1980, was not timely complied with.

The situation presented to the Appellate Division, First Department, in *People ex rel. Delrow v New York State Div. of Parole* (81 AD2d 391, *supra* [June, 1981]), where the Court of Appeals (52 NY2d 1057, *supra* [Feb., 1981]), in

reversing the First Department's original holding (75 AD2d 324 [June, 1980]), remitted the matter "for reconsideration in the light of *People ex rel. Gonzales v Dalsheim* (52 NY2d 9)" is distinguishable from this case. Upon such reconsideration, the court declined to apply the *Gonzales* rule, retroactively, *upon its finding* that the parolee, who had been lodged in a New Jersey penal institution, unlike *Gonzales,* fell outside the ambit of the compact for the supervision of out-of-State parolees because his "parole supervision was never transferred to New Jersey", and for the further reason "there was no existing administrative mechanism by which the Division of Parole could effect the return of relator for a parole violation hearing (*People ex rel. Spinks v Dillon,* 68 AD2d 368)" (81 AD2d 391, 395, *supra*). Motion for leave to appeal in *People ex rel. Delrow v New York State Div. of Parole* was dismissed on September 8, 1981 (54 NY2d 784) by reason of the relator's release from imprisonment.

In reversing a judgment dismissing a writ of habeas corpus, and restoring the petitioner to parole status for failure to afford him a timely final revocation hearing during the period from January 7 to August 14, 1980, while he was incarcerated in a New Jersey penal institution, this court, in *People ex rel. Brown v Walters* (84 AD2d 852, 853), decided November 30, 1981, held as follows: "Furthermore, we disagree with Special Term's view that the 'convenient and practical control' rule is only relevant in a situation where the parolee is in the sister State at the time of his arrest pursuant to the Uniform Act for Out-Of-State Parolee Supervision (Executive Law, § 259-m *et seq.*) * * * As noted in *People ex rel. Gonzales v Dalsheim* (52 NY2d 9, 15, *supra*), the compact between New York and New Jersey for out-of-State parole supervision (Executive Law, § 259-m *et seq.;* NJ Stat Ann, § 2A:168-14 *et seq.*), while containing explicit provisions for supervision by the receiving State over parolees of the sending State, in addition manifests '*a general disposition and readiness to foster interstate co-operation in parole matters*' (emphasis supplied)." Here, the record clearly demonstrates the existence of a Federal policy under which the transfer of prisoners to the penal facilities of the several States was

facilitated to accord them reasonably prompt hearings, and that such policy was known to exist and was available in the instant matter. To the same effect, this court in *People ex rel. Van Order v Walters* (86 AD2d 619 [Jan. 18, 1982]), in reversing a judgment dismissing a writ and restoring the petitioner to parole status, held the provisions of the New Jersey judgment of conviction, in providing for the parolee's release from a New Jersey penal facility to New York State authorities for the disposition of parole violation charges, brought him within their convenience and practical control and similarly available for such purpose.

The neglect and refusal of the Parole Board, under the circumstances of the instant case, to afford petitioner a final revocation hearing for over four and one-half years represents a continuing violation of his constitutional right to such hearing which subsisted from *day to day,* commencing, if not sooner, during the five-week period the petitioner was lodged in the Metropolitan Correctional Center in Manhattan, after the warrant was issued on April 1, 1976, until the day he was brought back to New York. Essentially, to the extent that the Parole Board contended that petitioner's removal to New York for a violation hearing was not required until the conclusion of his Federal sentence, the basis for its refusal to afford him an earlier hearing evaporated in December, 1976, when the Court of Appeals rejected the *Moody v Daggett* (429 US 78, *supra*) rule as a viable authority in this State.

While the petitioner was being thus deprived of a reasonably prompt revocation hearing during the passage of such time, the law, by an on-going process, had developed to a point under which his entitlement to the relief he seeks had ripened under the principles expressed in *Beattie, Walsh, Higgins,* and *Gonzales* (*supra*). As this court, in January, 1977, determined, in *People ex rel. Royster v Bombard* (55 AD2d 940, *supra*), *People ex rel. Orse v New York State Bd. of Parole* (55 AD2d 940, *supra*) and *Matter of Edge v Regan* (55 AD2d 940, *supra*), to retroactively apply the principle of *People ex rel. Walsh v Vincent* (40 NY2d 1049, *supra*) to those cases, I find, similarly, that a retroactive application of *Gonzales v Dalsheim* (52 NY2d 9, *supra*) to the instant matter will not have a deleterious

effect upon the administration of justice, and I am impelled so to conclude, for the further reason that, in reversing *People ex rel. Delrow v New York State Div. of Parole* (75 AD2d 324, *supra* [June, 1980]), the Court of Appeals (52 NY2d 1057, *supra* [Feb., 1981]) remitted the matter "for reconsideration in the light of *People ex rel. Gonzales v Dalsheim* (52 NY2d 9)".

Accordingly, the petition should be granted, on the law, with prejudice, the writ sustained, and petitioner restored to parole status.

DAMIANI, J. P., MANGANO and GULOTTA, JJ., concur; GIBBONS, J., concurs insofar as the appeal from the judgment is dismissed, but otherwise dissents and votes to reverse the order, vacate the judgment and sustain the writ, with an opinion.

Appeal from a judgment of the Supreme Court, Westchester County, entered December 23, 1980, dismissed, without costs or disbursements. Said judgment was superseded by an order of the same court, dated January 29, 1981, which granted reargument.

Order affirmed insofar as appealed from, without costs or disbursements.